*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1614**

In the Matter of the Welfare of the Child of: T. L. V. and B. F., Parents

**Filed March 2, 2015
Affirmed
Hooten, Judge**

Anoka County District Court
File No. 02-JV-14-213

Patricia A. Zenner, Zenner Law Office, Stillwater, Minnesota (for appellant appellant)

Anthony C. Palumbo, Anoka County Attorney, Kathryn M. Timm, Assistant County Attorney, Anoka, Minnesota (for respondent county)

Judi A. Albrecht, Eagan, Minnesota (Guardian ad Litem)

Considered and decided by Schellhas, Presiding Judge; Stauber, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

Appellant-mother argues that the record does not support the district court's termination of her parental rights and its determination that reasonable efforts have failed to correct the conditions leading to the child's out-of-home placement.  We affirm.

## FACTS

### *First contact with ACSS*

G.F., the subject of this proceeding, was born to appellant T.L.V. and father B.F.[1] in 2004. Respondent Anoka County Social Services (ACSS) first investigated appellant in September 2009, after receiving reports that appellant was endangering G.F. by keeping their residence in an unsafe and unsanitary condition, with garbage and cat feces scattered throughout the apartment. ACSS began providing voluntary services to appellant, and the assigned social worker became concerned that appellant's mental health problems, specifically her depression, were preventing her from keeping the residence sanitary and properly caring for G.F. Appellant then began to improve the condition of the home and attended several parenting skills classes.

### *First CHIPS proceeding*

Appellant ceased cooperating with ACSS in May 2010. A police welfare check revealed that the residence was again cluttered with garbage and rotten food. G.F. was placed into foster care and ACSS filed a child in need of protective services (CHIPS) petition. After adjudicating G.F. as a CHIPS, the district court approved ACSS's proposed case plan, which primarily directed appellant to keep the residence in a sanitary condition and seek therapy and medication for her depression. The district court also

---

[1] B.F., who, along with appellant, was served with the termination of parental rights (TPR) petition, did not participate in the proceedings that are the subject of this appeal. Although B.F.'s parental rights were also terminated by the district court order, B.F. did not appeal from the order.

ordered appellant to allow G.F. to receive play therapy, as appellant had previously resisted such therapy out of her distrust of therapists.

The principal issue in that proceeding and subsequent CHIPS proceedings was appellant's treatment of her mental health issues. Shortly after G.F. was first placed in foster care, ACSS learned of appellant's long history of mental health issues and her struggle with depression, which at that time were causing her to sleep up to 18 hours a day. Psychological testing confirmed appellant's mental health issues and indicated that she required psychiatric treatment and medication. A parenting evaluation echoed the results of psychological testing, providing that appellant needed to receive treatment and therapy for her depression in order to successfully parent G.F.

In December 2010, six months after G.F.'s placement in foster care, appellant sought psychiatric treatment and received medication for her depression. Appellant also began individual therapy in February 2011. Based on this case-plan compliance, G.F., who had now been in foster care for nearly eight months, was returned to appellant at the end of February 2011. Appellant ended play therapy for G.F. shortly before the CHIPS case was closed, but did continue her own therapy and medication at that time.

### Second CHIPS proceeding and first TPR petition

In December 2011, ACSS again investigated appellant after receiving reports that G.F. had several unexcused absences from school. Appellant was hostile to an ACSS social worker who made an unscheduled visit to the residence, and the social worker observed garbage and clutter throughout the residence. Appellant told the social worker that she was on medication, but was still sleeping 14–15 hours a day. The residence was

3

in better condition when the social worker visited the residence again in January 2012, but appellant continued to be reluctant to pursue therapy for herself and G.F.

Meanwhile, G.F. was displaying troubling behavior at school. She was frequently absent from school without an excuse. In addition, she exhibited "extremely disruptive, defiant behavior" when in school, such as yelling and running around the classroom. She began hoarding papers and miscellaneous items inside her desk and backpack. She also had one-sided conversations with imaginary creatures, including what she described as the ghost of a little girl who had committed suicide in the bathroom of her residence. School administration contacted appellant about these behaviors and offered to refer mental health services for G.F., but appellant refused the offered services.

The school suspended G.F. numerous times for these disruptions. After one of G.F.'s school suspensions in February 2012, appellant told ACSS that she was concerned about G.F.'s behavior at school and believed that she should return to a foster home. ACSS agreed to reopen voluntary services but remained concerned about appellant's mental health because she was no longer taking her depression medication.

In March 2012, school officials suspended G.F. again for disruptive behavior, which they believed was linked to appellant's communication of her dislike of the school staff to G.F. Appellant arrived at school to pick up G.F. and became upset, claiming that G.F.'s shirt had been torn by school staff. In response to this incident, ACSS decided to again remove G.F. to foster care and filed a CHIPS petition. When ACSS and police arrived at the residence to take G.F. to foster care, they again found the premises in an unsanitary condition and encountered belligerent resistance from appellant.

4

After her removal in March 2012, G.F. was again adjudicated as a CHIPS. The district court ordered her continued placement in foster care and approved a case plan with conditions similar to the first CHIPS case: appellant would keep her residence safe and sanitary, participate in any recommended therapy for G.F., obtain a full psychological assessment, and follow all treatment recommendations for her mental health problems. In spite of several reminders and meetings with ACSS, appellant exhibited reluctance to comply with the case plan, indicating that she wanted to make changes more slowly this time.

By September 2012, appellant was still not taking medication and had not begun therapy. She obtained a partial psychological assessment, but she later told a social worker that she had lied on the questions out of resentment toward ACSS. Later that month, she again informed ACSS that she was still not taking medication, and that she planned on moving to California for six months to learn how to make jewelry. She began individual therapy in October 2012, but she was still not receiving psychiatric treatment and continued to claim ignorance as to the conditions of her court-ordered case plan, instead indicating that she had her own plan in place. ACSS visited appellant's residence unannounced in November 2012 and found that conditions had "deteriorated" once more. Appellant told ACSS that she had seen a psychiatrist and had resumed medication. ACSS also requested a urinalysis from appellant during that visit. Appellant responded to that request with profanity before finally acquiescing to the test. The urinalysis test was negative for substance use.

5

ACSS filed a TPR petition in December 2012, largely because G.F. had already spent so much time in foster care. But, by February 2013, it appeared that appellant had begun to comply with the case plan. Her residence was in better condition. She attended most of G.F.'s play therapy sessions, had resumed her mental health treatment, and was attending therapy sessions. G.F.'s school social worker observed that G.F. had become "a very different child" while in foster care and was "much calmer, more engaged, [and] more easily redirected" at school.

By March 2013, G.F. was returned to appellant for a trial visit, as ACSS believed that appellant's therapy progress meant that termination of parental rights was not a viable option at that time and the residence was now in good condition. As a result of this second CHIPS proceeding, G.F. had spent 15 months in both foster care and in a trial home visit.[2] Combined with the first CHIPS proceeding, G.F. had an accumulated out-of-home placement total of 23 months at the time the case was ultimately closed in August 2013.[3] Appellant discontinued therapy shortly thereafter, and stopped taking her

---

[2] A trial home visit counts toward the accumulation of out-of-home placement time. Minn. R. Juv. Prot. P. 42.01, subd. 4(c).

[3] We are troubled by the August 2013 closure of the case, in light of the out-of-home permanency timelines established by statute and rule. Our juvenile protection laws are intended to ensure permanent and safe placement for the child "at the earliest possible time." Minn. Stat. § 260C.001, subd. 2(b)(7)(iv) (2014). The district court is required to commence permanent placement proceedings if the child has accumulated 12 months in foster care in the previous five years, with a six-month extension possible if compelling reasons exist and it is in the best interests of the child. Minn. R. Juv. Prot. P. 42.01, subd. 4(b). After the admit/deny hearing in a TPR proceeding, the district court is required to hold a trial within 60 days. Minn. R. Juv. Prot. P. 39.02, subd. 1(c). Continuances are only to be granted for good cause and "so long as the permanency time requirements set forth in these rules are not delayed." *Id.*, subd. 2. In addition, in cases where there has been a lengthy out-of-home placement, a court-approved out-of-home placement plan

medication in October 2013. G.F.'s therapy was also discontinued. Appellant failed to timely enroll G.F. in school that fall, claiming that she was sending G.F. to a Minneapolis school and that schools were closed for two weeks due to extreme heat. But, there was testimony establishing that an ACSS social worker had called the Minneapolis school with appellant and learned that schools were only closed for two days.

### *This case: third CHIPS proceeding and second TPR petition*

When G.F. entered third grade at a new school in the fall of 2013, she began exhibiting similar behavior problems. G.F. resumed having conversations with imaginary people and inanimate objects, and she was "extremely disruptive" in the classroom. She insulted and bullied other children. She began hoarding again, and filled her school locker so full with papers that she was given her own locker when two to three students typically shared one. There were concerns about G.F. injuring herself, as a teacher once found her scratching her arms with her fingernails and stating that she wanted to commit suicide. School staff frequently contacted appellant about these behaviors. They continually offered therapy and mental health support, but appellant repeatedly declined these offers. Appellant instead claimed to school staff that G.F. was already receiving outside therapy, which she later admitted was not true.

The school reached out to ACSS about G.F.'s behavior and its concerns about appellant, and ACSS again investigated the situation. A social worker met with G.F. in

---

and non-compliance with that plan, and reasonable efforts have been provided by the social services agency, there is a statutory presumption that reasonable efforts to rehabilitate the parent and reunite the family have failed. Minn. Stat. § 260C.301, subd. 1(b)(5) (2014).

7

February 2014, and found her "significantly different" than two years earlier. G.F. was "belligerent," calling two social workers "ugly and mean." ACSS could not reach appellant during an unannounced home visit that same day. ACSS then obtained a police hold and returned G.F. to foster care. After G.F. was removed from appellant's care and placed into the foster home, teachers found that G.F.'s defiant and disruptive behavior was no longer present at school.

ACSS filed a TPR petition with the district court, and an emergency protective care hearing was held on February 25, 2014. The district court found that a prima facie case existed for termination of parental rights and ordered that G.F. remain in protective care. Appellant denied the allegations in the petition at the subsequent admit/deny hearing. The district court then set the matter for trial and relieved ACSS of its obligation to continue reunification efforts with appellant.

The district court allowed ACSS to remain in communication with appellant. A social worker informed appellant that in order to visit G.F., she would have to comply with conditions similar to case plans in the prior CHIPS actions, including participation in mental health treatment. Appellant later testified that she knew what she needed to do to gain visitation rights for G.F. but refused to cooperate with these requirements. Instead, appellant claimed that she was handling her mental health issues by completing self-evaluation forms and visiting a walk-in therapist. She felt that additional treatment was unneeded as she had had "clarity" since the closure of the second CHIPS proceeding. Consequently, at a pre-trial hearing the district court found that G.F. could not be returned home, as appellant had not complied with the necessary conditions.

8

The district court conducted a three-day trial. After hearing testimony as to the above facts and considering written closing arguments of the parties, the district court concluded that ACSS had proven by clear and convincing evidence that appellant's parental rights should be terminated on five different statutory grounds, that this decision was in the best interests of G.F, and that ACSS had made reasonable efforts to reunite G.F. with appellant. This appeal followed.

## D E C I S I O N

Appellant argues that the record lacked clear and convincing evidence to support the termination of her parental rights under the statute. Courts presume that natural parents are fit to care for their children, and parental rights may only be terminated for "grave and weighty reasons." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012). The petitioning county bears the burden of proving grounds for termination by clear and convincing evidence. *In re Welfare of M.H.*, 595 N.W.2d 223, 227 (Minn. App. 1999). "We review the termination of parental rights to determine whether the district court's findings address the statutory criteria and whether the district court's findings are supported by substantial evidence and are not clearly erroneous." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). We conduct a close review of the record in determining whether the evidence is clear and convincing, *id.*, and affirm the district court's decision if any one of the statutory grounds for termination are supported by clear and convincing evidence and termination of parental rights is in the child's best interests. *In re Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008). We grant its decision considerable deference because the district court is in a superior

position to assess the credibility of witnesses. *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

## I.

The district court found clear and convincing evidence in support of five statutory bases for terminating appellant's parental rights. *See* Minn. Stat. § 260C.301, subd. (1)(b)(1), (2), (4), (5), (8). Appellant asserts that none of these five bases were sufficiently supported by clear and convincing evidence. We will address termination under section 260C.301, subdivision 1(b)(2), as only one statutory ground must be supported by clear and convincing evidence in order for us to affirm. *See T.R.*, 750 N.W.2d at 661.

Under section 260C.301, subdivision 1(b)(2), parental rights may be terminated if the parent is physically and financially able to provide care but has "substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to" providing the "care and control necessary for the child's physical, mental, or emotional health and development," and reasonable efforts by social services to correct the problematic conditions have either failed or would be futile and therefore unreasonable. In analyzing this statutory ground, the district court found that appellant had repeatedly refused to correct the conditions that had led to the previous CHIPS actions—her unsanitary home environment and her mental health issues. The district court further found that appellant had neglected G.F.'s education by failing to correct G.F.'s negative behaviors and by failing to ensure G.F. attended school. The district court concluded that the efforts of

ACSS to correct these conditions were reasonable but had failed, and that further efforts would be futile and therefore unreasonable.

Appellant attempts to rebut the district court's decision by challenging several of its fact findings. Her arguments are unavailing. She contends that G.F.'s late school enrollment in the fall of 2013 was an honest mistake on her part. But the district court expressly found her testimony not credible on this point, as an ACSS employee testified that she had called the school system while talking with appellant in order to verify the school-start date. Appellant claims that she consistently sought out therapy and medication in each CHIPS case, but the record shows that she also consistently canceled all therapy and medication once court involvement ended and refused to obtain mental health treatment during this proceeding. She argues that G.F.'s conversations with imaginary creatures were mischaracterized by school staff because G.F.'s therapist never witnessed such behavior. But the district court's findings on this point are not clearly erroneous; several school professionals, at two different schools over two different time periods, testified to this behavior, and we defer to the district court's decision to credit their testimony. *See L.A.F.*, 554 N.W.2d at 396. Finally, appellant claims that her apartment's condition was not a significant recurring issue, as G.F. was removed from the residence on that basis only once. But this is a mischaracterization of the record; while G.F. was removed *expressly* due to these unsanitary conditions in the first CHIPS action, ACSS observed similar conditions multiple times after that and would then remove G.F. for additional reasons.

She further claims that her failure to follow the case plan authorized by ACSS and the district court, and instead follow her own plan, is insufficient to allow for termination. However, "[f]ailure to satisfy requirements of a court-ordered case plan provides evidence of a parent's noncompliance with the duties and responsibilities under section 260C.301, subdivision 1(b)(2)." *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 666 (Minn. App. 2012). As appellant admitted her noncompliance at trial, her argument is unpersuasive.

Since 2010, G.F. had been in foster care for more than 26 months due to appellant's refusal to follow her mental health treatment plan and comply with her other court-ordered conditions. In this latest case, G.F. was not returned to appellant because of her refusal to follow a case plan intended to remedy her mental health issues and protect G.F. from further harm. As addressed below, ACSS provided numerous services to appellant, and the district court's findings as to their reasonableness and futility in this action are not clearly erroneous.

As a whole, the record contains clear and convincing evidence supporting the district court's conclusion that appellant repeatedly refused to comply with her parental duties by failing to provide for G.F.'s educational and behavioral needs, while also neglecting her own mental health treatment and the cleanliness of their residence. Appellant was physically and financially able, and reasonable services provided by ACSS were ultimately futile. Therefore, the district court's termination of appellant's parental rights under Minn. Stat. § 260C.301, subd. 1(b)(2) is supported by this record, and the district court did not abuse its discretion by invoking this basis for terminating appellant's

parental rights. *See In re Welfare of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011) (noting that if the district court finds facts that support the existence of a statutory basis to terminate parental rights, whether to invoke that statutory basis is discretionary with the district court), *review denied* (Minn. Jan. 6, 2012).

## II.

District courts are required to give "paramount consideration" to the best interests of the child in terminating parental rights. Minn. Stat. § 260C.301, subd. 7 (2014). A district court does this by weighing three primary factors: (1) the child's interest in maintaining the parent-child relationship, (2) the parent's interest in maintaining that relationship, and (3) any competing interest of the child. *In re Welfare of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013). "An order terminating parental rights must explain the district court's rationale for concluding why termination is in the best interests of the child[.]" *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003). We review the district court's best-interests decision for an abuse of discretion. *J.R.B.*, 805 N.W.2d at 905.

The district court explicitly addressed G.F.'s best interests in its order:

> There is clear and convincing evidence that it is in the best interests of [G.F.] that . . . the parental rights of [appellant] and [B.F.] be terminated. In making this determination, the [c]ourt has considered the interests of the parents and the child in preserving the relationship. The child's need for stability, safety and permanency, with nurturing, competent caregivers, outweigh any competing interests of the parents.

Appellant argues that this statement is insufficient to support a determination that termination of parental rights is in G.F.'s best interests. We have remanded TPR decisions when district courts wholly fail to address whether the termination of parental

13

rights is in the best interests of the child. *See, e.g.*, *Tanghe*, 672 N.W.2d at 626. But that was not the case with the district court's order here. The paragraph quoted above provides a summary of the district court's concern for G.F.'s needs that runs throughout the district court's order. The order was very detailed in describing the repeated unsanitary conditions at appellant's residence, the behavioral problems of G.F. that would abate when she was placed in foster care, and appellant's repeated unwillingness to address the root cause of these issues, her depression.

Appellant also contends that the evidence at trial showed that she was now sufficiently addressing her mental health issues to allow G.F. to be returned to her. The record does not support this argument. As shown above, the district court found that she was *not* addressing her mental health issues, and this finding was supported by the record. The district court did not abuse its discretion in ruling that termination of appellant's parental rights was in the child's best interests.

**III.**

Appellant lastly argues that the district court failed to properly make findings about reasonable reunification efforts provided by ACSS. In TPR proceedings, the district court is required to make findings of fact addressing the adequacy of the efforts made to reunite the family, or to find that such efforts would be futile. *In re Children of T.A.A.*, 702 N.W.2d 703, 709 (Minn. 2005); *see also* Minn. Stat. §§ 260.012; 260C.301, subd. 8(1) (2014).

Early in the case, the district court relieved ACSS of its "obligation to pursue reunification efforts" with appellant, but ordered ACSS to remain in communication with

14

appellant and grant visitation at its discretion. After trial, the district court made findings as to reasonable efforts provided by ACSS throughout the history of the various CHIPS actions:

> 89. The conditions which [led] to the involvement of [ACSS] in 2010 have not been corrected. Despite the reasonable efforts of [ACSS] and the availability of services, the same conditions of an unreasonable home environment and the mental health of [appellant] have not been corrected.
>
> . . . .
>
> 93. [Appellant] remains hostile to mental health services, therapy or medications for herself or [G.F.] She engaged those services only when under [c]ourt supervision. Absent [c]ourt supervision, [appellant] terminated services. . . . Even though contact with [G.F.] since February 2014 has been conditioned on her being in therapy and on medications, [appellant] has remained committed to her position that no therapy or medications are necessary.

Appellant first argues that the district court was required by statute to explicitly make fact findings supporting its pretrial decision to relieve ACSS of its reunification obligation. Her argument is unpersuasive in light of the fact that the district court explicitly found the reunification efforts of ACSS to be reasonable in *each* of its pretrial orders and in its order terminating parental rights. The district court, in a subsequent pretrial order, found that "[t]he conditions which led to the out-of-home placement [had] not been corrected." And on the whole, the record shows that appellant was offered a long list of services from ACSS in both this action and previous CHIPS actions, including parenting skills classes, psychiatric treatment, and therapy for herself and G.F. She consistently refused those services, to the detriment of herself and G.F.

15

Moreover, we do not reverse for harmless error. *See In re Welfare of Children of D.F.*, 752 N.W.2d 88, 98 (Minn. App. 2008). The record shows that the district court and ACSS, up until trial, continued to give appellant an opportunity to obtain visitation with G.F. if she began to comply with the mental health treatment conditions outlined in case plans from the previous CHIPS actions. Any error by the district court was harmless in light of the evidence showing that appellant knew of these conditions and could have complied with them if she wanted to take steps toward reunification. She failed to do so.

Appellant also argues that the district court erred in determining after trial that the efforts for rehabilitation and reunification provided by ACSS were reasonable. The juvenile court is required to consider a number of factors in making this determination, including the services' relevance, adequacy, availability, consistency, and whether the services were realistic under the circumstances. Minn. Stat. § 260.012(h). Appellant claims that the efforts of ACSS were not reasonable in light of these factors and instead were "a test to demonstrate parental failure," *In re Welfare of J.H.D.*, 416 N.W.2d 194, 198 (Minn. App. 1987), *review denied* (Minn. Feb. 12, 1988), because "no one worked with [a]ppellant to truly help her understand the ongoing need to continue therapy and medication for herself and her child."

She first points to specific actions of ACSS regarding a therapist recommendation and the use of adult rehabilitative mental health services (ARMHS). But, a social worker testified that ARMHS was in contact with appellant and closed her case because appellant failed to return their phone calls. And while a 2010 psychological evaluation did make suggestions for appellant's therapy, such as use of an older female therapist, it

16

is difficult to see the consequence of ACSS's failure to ensure this recommendation was followed: appellant later set up her own therapy and chose a male therapist she found on the Internet. Appellant further claims that she was unable to obtain these services on her own, and that she had become more cooperative with service providers in this latest proceeding. Again, these arguments are unsupported by the record. The first social worker on the case received no indication that appellant was cognitively unable to set up appointments, in spite of the fact that appellant's depression at that point was causing her to sleep 18 hours a day. And the record shows that appellant was typically very uncooperative with service providers, both at ACSS and at G.F.'s schools.

Therefore, appellant has not shown that the district court's finding that ACSS provided reasonable efforts toward rehabilitating appellant and reunifying her with G.F. is clearly erroneous.

**Affirmed.**