**In the Matter of the WELFARE
OF L.A.F.**

No. C4–95–1740.

Supreme Court of Minnesota.

Oct. 3, 1996.

Wright S. Walling, Jody Ollyver DeSmidt, Walling & Berg, P.A., Minneapolis, for Kathleen J. Foley.

Michael J. Long, Theis & Long, P.A., Glencoe, for Richard Daily.

Jeanne M. V. Conkel, Gavin, Olson, Conkel & Savre, Ltd., Glencoe, for L.A.F.

## OPINION

KEITH, Chief Justice.

In this case, appellant Kathleen Foley seeks termination of the parental rights of the respondent, Richard Daily, to his now 4–year–old biological daughter, L.A.F. Foley, the biological mother of L.A.F., petitioned the district court for termination of Daily's parental rights so that L.A.F. could be adopted by her current custodians. The district court found that Daily abandoned L.A.F. and refused or neglected to comply with his parental duties, and that termination of Daily's parental rights was in the best interests of L.A.F. *See* Minn.Stat. § 260.221, subds. 1, 4 (1994 & Supp.1995). The court of appeals reversed, finding clear error in the district court's conclusions. Because we believe the evidence supports the district court's findings that Daily abandoned L.A.F., and because termination of Daily's

parental rights is in the best interests of L.A.F., we reverse the court of appeals.

The facts are essentially undisputed. Appellant Foley and respondent Daily lived together from late 1992 until May 1993. Foley became pregnant in January 1993, and Daily later accompanied Foley to the Faribault Clinic where her pregnancy was confirmed. Foley testified that her only sexual relations during that time period were with Daily, but apparently Daily questioned whether he was the father. Daily and Foley had several conversations about the pregnancy, and Foley told Daily that she was considering putting the child up for adoption.

In May 1993, Foley and Daily's relationship ended when Daily picked up Foley from a party at his mother's house, told her that he did not want to see her anymore, and dropped her off at her sister's house. He told Foley that he had informed her parents the day before that he was ending their relationship, and Foley's parents had agreed to let her live with them in Alexandria. Prior to that day, Foley had no idea that Daily intended to end their cohabitation. Foley and Daily had only one conversation that summer, and no additional contact until after the child was born on September 26, 1993. Daily did not provide Foley with financial assistance during her pregnancy.

In July 1993, Foley contacted Caritas Family Services in St. Cloud and met with a pregnancy counselor, Jane Marrin, to discuss her options. Marrin met with Foley approximately once a week until the child was born in September. During these meetings, Foley completed a decision-making booklet and then began the adoption process.

Foley told Marrin that Daily was the father of her child, and Marrin attempted to contact Daily by telephone. But because Daily's telephone service was disconnected, Marrin failed to reach him and instead sent him a letter on August 10, 1993, informing him of Foley's decision to place the child with adoptive parents. The letter from Caritas outlined the two legal means of terminating parental rights in order to free a child for adoption, and requested that Daily complete a health history form. The letter also informed Daily that he was not to contact

Foley directly, but was to address any questions to Marrin. Daily did not complete the health history form, but he did call Caritas several days later to talk to Marrin. Marrin was not in the office at the time, but her supervisor spoke with Daily.

Daily's next contact with Foley was a telephone conversation on September 27, 1993, the day after L.A.F. was born. Daily learned of L.A.F.'s birth through a third party, and Foley testified that Daily called her to find out L.A.F.'s sex, height and weight, and if L.A.F. looked like either of them. Since that time, he has not contacted Foley directly, nor has he offered any financial support for L.A.F.

Several days after L.A.F.'s birth, Daily called Marrin at Caritas to request a visit with L.A.F. At that time, he informed Marrin that he had retained an attorney, but that he needed to see L.A.F. in person to decide what his course of action would be. Foley consented to the visitation, and Daily and his mother came to the Caritas office in St. Cloud on October 8, 1993 to see L.A.F.

During the visit, Daily told Marrin that he was no longer represented by his first attorney, but that he was on his way to Alexandria to retain new counsel. Marrin informed Daily that if he refused to consent to Foley's adoption plans, Foley would parent the child herself. When Daily left, he said that he would let Marrin know what his decision was regarding termination, but when Marrin later tried to reach him at the telephone numbers he provided, they were no longer in service.

In November 1993, Foley requested that the Stearns County Attorney file a petition for termination of parental rights stating that Foley had consented to the termination of her parental rights and was seeking termination of Daily's rights due to his abandonment of the child. On December 1, the parties appeared in Stearns County District Court and Daily requested a continuation in order to pursue a paternity action with the assistance of an attorney in Mankato. The hearing was rescheduled, and on December 29, 1993 the parties again appeared in court.

At the second hearing, Daily again stated that he intended to file a paternity action and requested that a public defender be appointed to represent him. Foley and the county attorney agreed to withdraw the petition in light of Daily's plans to pursue a paternity action and obtain blood tests.[1] But, because the petition was withdrawn, no attorney was appointed for Daily at that time.

In early December 1993, Daily contacted Marrin and requested a second visit with L.A.F. Foley refused to consent to further visitation. Foley testified that she refused the request because Daily was not cooperating with her placement plans or with Caritas, and because she did not trust him to be alone with L.A.F.

Daily testified that he did not request further visitation with L.A.F. after December 1993 because he believed his request would be denied by Foley. He claims that he always intended to be "involved in" L.A.F.'s life, but first wanted to establish conclusively that L.A.F. was his child. However, Marrin testified that during their conversations after L.A.F. was born, Daily stated that he did not want to parent L.A.F. himself, and instead wanted Foley to keep the child.

Daily filed an affidavit of intention to retain parental rights with the state, which would have conclusively established parenthood had Foley consented. *See* Minn.Stat. § 259.51, subds. 1, 3. On December 13, 1993, the Minnesota Department of Health sent Foley a letter informing her of Daily's request. Foley challenged Daily's request in a letter to the Vital Statistics Division dated January 6, 1994. On January 12, 1994, Daily's attorney was notified by Vital Statistics that, without Foley's consent, a court order was necessary to establish paternity.

After L.A.F. was born in Alexandria on September 26, 1993, she spent her first 3 months of life in a foster home selected by Caritas, and then was placed in her pre-adoptive home in January 1994. In the spring of 1994, L.A.F.'s adoptive parents sought to finalize the adoption through proceedings in McLeod County.

---

1. Daily testified that several of the lawyers with whom he spoke during 1993 and 1994 told him that he could not obtain blood test results until L.A.F. was 6 months old.

A hearing on the adoption was held on May 19, 1994, and Daily appeared. For the third time since December 1993, Daily stated that he wished to establish paternity of L.A.F. The district court granted him 2 weeks to commence a paternity action. Attorney James Hulwi was appointed to represent Daily in the paternity action and on May 26, 1994 he filed the action on Daily's behalf. However, Daily did not request blood testing until October 25, 1994, approximately 13 months after L.A.F. was born.[2]

On September 15, 1994, Foley brought a second petition for termination of Daily's parental rights in McLeod County, which is the subject of this appeal. The district court appointed Delores Brunner guardian ad litem of L.A.F. Brunner filed her report on February 1, 1995 and recommended termination of Daily's parental rights. Brunner also recommended that the pre-adoptive parents retain custody of L.A.F. Brunner described L.A.F. as a "normal, happy, very contented child" in a stable home.

A hearing on Foley's termination petition was held in McLeod County before Judge Thomas McCarthy on March 14 and 15, 1995. In view of the blood test results that arrived earlier that month, the parties stipulated to paternity on the first day of the termination hearing. Because this termination petition was private, the county attorney's office was not present and Foley was represented by her own counsel. Foley's counsel called Marrin, Foley and Brunner to testify, and called Daily as an adverse witness. Daily's counsel called David Johnson, a counselor where Daily attends technical college, Colleen Grant, Daily's sister, and Daily himself.

On July 10, 1995, the district court terminated Daily's parental rights. The court found that Daily had abandoned L.A.F., with or without the statutory presumption in Minn.Stat. § 260.221, subd. 1(b)(1), and that Daily refused or neglected to comply with his parental duties under subd. 1(b)(2). The court also found that termination of Daily's

parental rights was in L.A.F.'s best interests. See Minn.Stat. § 260.221, subd. 4.

Daily appealed, and the court of appeals reversed. In re Welfare of L.A.F., 546 N.W.2d 55, 60 (Minn.App.1996). The court of appeals held that the district court's ruling regarding abandonment was clearly erroneous because "Daily's alleged failure to parent L.A.F. is explained both by his uncertainty as to his paternity and by the efforts of others who effectively blocked his attempts to assert paternity, without which he was emphatically denied the right to visit or otherwise parent L.A.F." Id. at 59. The court believed that Daily's appearances at court hearings and attempts to retain counsel demonstrated an intent to protect his legal rights, rather than forsake them. Id. The court of appeals also rejected the finding that Daily refused or neglected to comply with his parental duties because neither Caritas nor any other social service agency made reasonable efforts to correct such refusal or neglect by Daily. Id.

Foley appealed, claiming that the district court's conclusions were not clearly erroneous. This court granted expedited review on June 19, 1996.

In reviewing a lower court's decision to terminate parental rights, an appellate court must determine whether the district court addressed the applicable statutory criteria, whether the court's findings were supported by substantial evidence, and whether the court's conclusions were clearly erroneous. In re Welfare of M.D.O., 462 N.W.2d 370, 375 (Minn.1990). Considerable deference is due to the district court's decision because a district court is in a superior position to assess the credibility of witnesses. Id. at 374–75.

To involuntarily terminate parental rights, the district court must find that at least one of the eight statutory conditions for termination exist. See Minn.Stat. § 260.221,

**2.** Foley offers this date without citation to the record, but Daily does not dispute this date. Judge McCarthy first ordered blood tests on December 16, 1994. For reasons unexplained in the record, the district court also heard arguments regarding blood testing on February 2, 1995, and Judge McCarthy issued a second order for blood tests on February 16, 1995. In any event, the results arrived on March 7, 1995 and established that Daily was L.A.F.'s biological father.

subd. 1(b). "The child's best interests, however, remain the paramount consideration in every termination case." *M.D.O.*, 462 N.W.2d at 375. The bases for termination in the Minnesota Juvenile Code include:

(1) That the parent has abandoned the child. Abandonment is presumed when:

(i) the parent[3] has had no contact with the child on a regular basis and no demonstrated, consistent interest in the child's well-being for six months; and

(ii) the social service agency has made reasonable efforts to facilitate contact, unless the parent establishes that an extreme financial or physical hardship or treatment for mental disability or chemical dependency or other good cause prevented the parent from making contact with the child. * * *. The court is not prohibited from finding abandonment in the absence of this presumption; or

(2) That the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental or emotional health and development, if the parent is physically and financially able, and reasonable efforts by the social service agency have failed to correct the conditions that formed the basis of the petition; * * *.

Minn.Stat. § 260.221, subd. 1(b)(1)–(2).[4] "[N]o prior judicial finding of dependency, neglect, [or] need for protection or services" is necessary. *Id.* § 260.221, subd. 3. However, the district court must find by clear and convincing evidence that at least one of the

conditions for termination exists. *Id.* § 260.241, subd. 1.

■ Foley maintains that she provided clear and convincing evidence that Daily abandoned L.A.F. Even if a presumption of abandonment was not proper because Caritas was not a "social service agency" or because Caritas did not make "reasonable efforts to facilitate contact" between Daily and L.A.F., Foley emphasizes that the statute expressly permits termination "in the absence of this presumption." Minn.Stat. § 260.221, subd. 1(b)(1)(ii).

As Foley indicates, the statutory presumption in section 260.221, subdivision 1(b)(1) is only one method of demonstrating abandonment. The plain language of the statute indicates that, under subdivision 1(b)(1), social service agency involvement is required only if the petitioner seeks to establish a *presumption* of abandonment.

Daily contests this interpretation. He believes that the statute should be read to require reasonable social service agency efforts to facilitate contact with a parent alleged to have abandoned a child. Daily relies on *In re Welfare of S.Z.*, 547 N.W.2d 886 (Minn.1996). There, we held that Minn.Stat. § 260.012(c) required findings regarding reasonable efforts by a social service agency to prevent the removal of a child from the home because of a parent's palpable unfitness. *S.Z.*, 547 N.W.2d at 892.

Contrary to Daily's assertion, the discussion in *S.Z.* concerning section 260.012 only addressed necessary district court *findings*. It certainly did not require *involvement* by social service agencies to prevent termination of rights in all cases. For example, in *S.Z.* we made clear that "[i]n some cases, any provision of services or further provision of

---

3. A "parent" is the "birth or adoptive parent of a minor." Minn.Stat. § 260.015, subd. 11.

4. "Agency" is defined as "the local social service agency or a licensed child-placing agency." Minn.Stat. § 260.015, subd. 1a. "Child-placing agency" means "anyone licensed under sections 245A.01 to 245A.16 and 252.28, subdivision 2." *Id.* § 260.015, subd. 3. Chapter 245A is devoted to the Human Services Licensing Act, and requires all organizations that plan the placement of children in foster care or for adoption to obtain a license from the Commissioner of Hu-

man Services. *Id.* § 245A.03, subd. 1. Without citation to the district court record, Foley claims that Caritas Family Services is licensed as a child placing agency, and therefore satisfies section 260.221 and the statutory definitions of the term. Daily has disputed this assertion before this court and in the courts below. The district court agreed with Daily that because Caritas was "strictly interested in pursuing the adoption" of L.A.F., and was therefore working against Daily's interests, the agency did not qualify under section 260.221. The court of appeals affirmed.

services would be futile, and therefore unreasonable." *Id.*

We conclude that, under the involuntary termination provisions of the statute, the district court was free to consider the assertion that Daily abandoned L.A.F. even though a social service agency was not making efforts to ensure that Daily established and retained parental rights. The legislature has, in other areas, required that social service agencies become involved to help parents meet their responsibilities under the law. We decline to extend such requirements to this case in the absence of similar policy statements by the legislature. *Compare* Minn.Stat. § 260.221, subd. 1(b)(1)(ii) (creating a presumption of abandonment when, in part, a social service agency made reasonable efforts to facilitate contact with the parent, but explaining that abandonment does not require such efforts) *with id.* § 260.012(a) (requiring court assurance that reasonable efforts are made by an agency to reunite a child with the family when a child is in need of protective services and is under the court's jurisdiction).

■ We therefore consider whether there was substantial evidence in the record or clear error in the district court's conclusion that Daily abandoned L.A.F., in absence of the statutory presumption. Although section 260.221 does not define the term "abandonment," this court has held that abandonment requires both actual desertion of the child and "an intention to forsake the duties of parenthood." *In re Welfare of Staat,* 287 Minn. 501, 506, 178 N.W.2d 709, 713 (1970) (holding that incarceration does not constitute abandonment per se). Thus, in order to satisfy the statute, Foley must establish that Daily's abandonment of L.A.F. was intentional, rather than "due to misfortune and misconduct alone." *Id.*

■ In support of the district court's finding, Foley argues that Daily intentionally abandoned L.A.F. because he had no contact with L.A.F. other than one visit 2 weeks after L.A.F.'s birth, showed no consistent interest in L.A.F.'s well-being, never offered to help Foley with child-bearing or child-rearing expenses, deserted Foley when she was 5 months pregnant, and failed to aggressively pursue a paternity action. Foley also points to Daily's failure to secure his paternal rights once he saw L.A.F. in October 1993 and became convinced that L.A.F. was his child. Daily contacted various attorneys and legal assistance organizations during L.A.F.'s infancy to discuss his situation, and yet he continued to delay filing a paternity action until the district court gave him an ultimatum in May 1994. If Daily had established his paternity at an earlier date, argues Foley, he could have pursued visitation with L.A.F., contributed financially to her support, and perhaps initiated a parent-child relationship.

■ Daily responds that his alleged abandonment of L.A.F. was not intentional, but was due to circumstances beyond his control. He claims that his failure to pursue a paternity action was due to his belief that a blood test could not be performed until L.A.F. was 6 months old. In addition, Daily points out that he attempted to resolve the paternity issue by filing an affidavit with the Vital Statistics Division of the Department of Health, an attempt that was unsuccessful because Foley refused to consent.

The outcome of this case turns on a determination of Daily's intentions. After hearing testimony from Daily and others, the district court concluded that Daily's true intention was to thwart Foley's plans for L.A.F.'s adoption, but avoid parenting responsibilities for himself. The district court concluded that between Daily's sole visit with L.A.F. on October 8, 1993 and his paternity action (required by the district court) over two and a half years later, Daily had no intention of accepting parental responsibility for L.A.F. In fact, Marrin informed Daily that Foley planned to parent L.A.F. if Foley's plans for L.A.F.'s adoption did not move forward. Moreover, the court noted that Daily did nothing to establish paternity between January 12, 1994—when he was notified by Vital Statistics that a court order would be necessary to establish paternity—and May 26, 1994—when he at last filed a paternity action, after the district court gave him an "ultimatum." At oral argument before this court, Daily's counsel had no explanation for Daily's failure to make efforts to establish paternity between January and May of 1994.

And even if Daily believed that he had to wait 6 months from L.A.F.'s birth before blood tests for paternity could be conducted, he waited approximately 13 months before requesting the tests. There was substantial evidence for the district court to conclude that Daily was engaged in "legal maneuvering," and not a sincere effort to serve L.A.F.'s interests or to accept parental responsibility for L.A.F.

Inferences about Daily's intentions were best made by the district court. *See M.D.O.,* 462 N.W.2d at 374–75. As to any supposed uncertainty about paternity, the district court found that Daily believed the child was his after his visitation. As to the efforts of others to stop Daily from establishing legal rights to L.A.F., the district court noted that Daily was aware that he could overcome obstacles to a parent-child relationship by pursuing a paternity action, and legal counsel was available to him for that purpose. Instead, he delayed, offered "empty promises" to the court, and provided no emotional or financial support for L.A.F.

Thus, Daily's court-prompted paternity action is insufficient grounds for overruling the trial judge's conclusion on abandonment. As the district court concluded, "Daily's empty promises to the various Courts regarding his willingness to start paternity actions were convenient methods to block the adoption procedures, but were clearly not intended to take on any responsibility in L.A.F.'s life." And because Daily was told that Foley would attempt to retain custody and parent L.A.F. if the adoption was thwarted, the court had sufficient evidence in the record to conclude that Daily's paternity action and acceptance of paternity on the first day of the adoption hearing were not efforts to accept parental duties. The district court had sufficient grounds for finding that Daily had no intent to parent L.A.F. and that Daily abandoned L.A.F.

■ Because the district court did not clearly err in finding that Daily abandoned L.A.F., the statute requires that the court consider the best interests of the child. *See* Minn.Stat. § 260.221, subd. 4. The district court balanced the interests of L.A.F. and Daily in preserving a parent-child relationship, and the competing interests of L.A.F., especially her interest in a stable environment. *See In re Welfare of J.J.B.,* 390 N.W.2d 274, 279 (Minn.1986). The court concluded that there was no parent-child relationship to preserve because Daily had seen L.A.F. only once, and that this absence of relationship was the result of Daily's failure to take responsibility and establish his legal rights to parent L.A.F. The court noted L.A.F.'s stable and healthy home with her pre-adoptive parents, and Daily's unstable living situation, unfinished education, lack of employment, and criminal record. On balance, the court concluded that L.A.F.'s best interests were in the termination of Daily's parental rights.

On appeal to this court, Daily does not challenge the district court's findings or conclusion regarding L.A.F.'s best interests.

Because the district court's conclusion that Richard Daily abandoned L.A.F. was not clearly erroneous, it is in the best interests of L.A.F. that Daily's rights be terminated.

Reversed.