*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0555**

In the Matter of the Welfare of the Child of: K. F., Parent

**Filed August 18, 2014
Affirmed
Smith, Judge**

Ramsey County District Court
File No. 62-JV-13-2937

Patrick D. McGee, Forest Lake, Minnesota (for appellant)

John J. Choi, Ramsey County Attorney, Daniel R. Rait, Assistant County Attorney, St. Paul, Minnesota (for respondent Ramsey County)

John M. Jerabek, Tuft, Lach & Jerabek PLLC, Maplewood, Minnesota (for respondent guardian ad litem)

Considered and decided by Larkin, Presiding Judge; Bjorkman, Judge; and Smith, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SMITH**, Judge

We affirm the child-in-need-of-protective-services (CHIPS) adjudication because the district court's decision is supported by clear and convincing evidence and its factual determinations are not clearly erroneous.

# FACTS

In November 2013, respondent Ramsey County petitioned the district court to adjudicate C.R. as a child in need of protection or services, alleging educational neglect by his mother, appellant K.F. A county child-protection worker was assigned to assess C.R.'s risk level, but K.F. refused to answer her questions. The district court appointed a guardian ad litem to represent C.R.'s interests. It held an evidentiary hearing on March 10, 2014, receiving testimony from school staff, county social workers, the guardian ad litem, and K.F.

K.F. testified that in 2007, before enrolling C.R.in a pre-kindergarten program, she sought an evaluation based on his "hyper" and "inattentive" behavior, and because she believed that C.R.'s "speech wasn't clear for his age." An assessment found that C.R.'s speech required special education services. K.F. enrolled C.R. in the pre-kindergarten program, but the program terminated his enrollment after a behavioral incident.

K.F. enrolled C.R. in a kindergarten program at a St. Paul public elementary school. School officials developed an individualized education program (IEP) to address C.R.'s special needs, which were purportedly identified as "developmental delay." Although K.F. testified that the IEP was effective in helping C.R., the record establishes that she withdrew him from kindergarten in early October. Nearly five months later, she enrolled C.R. in a kindergarten program at a second St. Paul public elementary school. K.F. testified that school staff used C.R.'s existing IEP. In the final three-and-one-half months of his kindergarten year, C.R. accumulated seven excused absences, 10 unexecused absences, and 12 tardies.

C.R. began first grade at the same school. By the end of January 2010, C.R. accumulated 26 excused absences, 18 unexcused absences, and 10 tardies. Many of the excused absences were the result of suspensions or dismissals, which normally result from a student's disruptive behavior.

In February 2010, K.F. transferred C.R. to an online charter school. A social worker testified that, because the online school is not a St. Paul public school, he did not have access to its attendance records. He also testified that, in response to C.R.'s attendance problems at the public schools, K.F. was referred to a truancy-intervention program. During a hearing in March 2010, K.F. signed a contract, promising to ensure C.R.'s school attendance and provide reports on his work and attendance at the online school.

In May 2010, after Ramsey County filed a petition alleging educational neglect,[1] K.F. transferred C.R. to a third St. Paul public elementary school for the last month of his first-grade year. During that month, C.R. accumulated one excused absence, one unexcused absence, and one tardy. C.R. continued at the same school through second grade, accumulating five excused absences, five unexcused absences, and 11 tardies. School officials developed a new IEP for C.R., which changed his diagnosis from "developmental delay" to "emotional/behavior disorder," or EBD. K.F. objected to the use of the EBD designation to describe C.R.'s special needs. She testified that the EBD designation was "stigmatizing" for her family and tended to "push[] African American

---

[1] The record suggests that the 2010 petition resulted in a CHIPS adjudication, but it was dismissed after C.R.'s school attendance improved.

children, particularly with disabilities, out of the school system and into the hands of Child Protective Services." She testified that, when she expressed her objections to school officials, she was told that she was an ineffective parent and that school officials did not incorporate her suggested addendums into C.R.'s IEP.

In September 2011, after a brief stint in Las Vegas, K.F. enrolled C.R. in the third grade at a fourth St. Paul public elementary school. K.F. testified that, in December 2011, she also obtained an evaluation of C.R. from the Hennepin County Medical Center, resulting in an autism diagnosis. This fueled her belief that the EBD designation was a misdiagnosis, resulting in school officials providing the wrong services to C.R. Based on this belief and related concerns, K.F. stopped sending C.R. to school. In April 2012, after C.R. was absent for 15 consecutive days, the school dropped him from its rolls. By that point of his third-grade year, C.R. had accumulated 15 excused absences, 33 unexcused absences, and eight tardies.

A month after C.R. was dropped from the school's rolls, with approximately three weeks remaining in the school year, K.F. enrolled him at a fifth St. Paul public elementary school. The county attorney again petitioned for a CHIPS adjudication, alleging educational neglect. K.F. challenged the petition, and it was dismissed.

For his fourth-grade year, K.F. enrolled C.R. in a second charter school that offered both a "fusion" program that mixed in-person attendance with online schoolwork and a program that offered only online schoolwork. C.R. was initially enrolled in the fusion program. In accordance with C.R.'s IEP, the charter school provided him with special services—including speech, occupational therapy, and one-on-one instruction—

4

during his in-person attendance days. K.F. testified that C.R.'s IEP included both the EBD designation and the autism diagnosis, notwithstanding her continued objections to the EBD designation.

During his fourth-grade year, school staff observed that, although C.R. usually attended school during the in-person attendance days, he often failed to complete his online schoolwork. They reported the situation, and K.F. was again referred to a truancy-intervention program. K.F. signed another school-attendance contract, pledging to ensure C.R.'s attendance and to "cooperate with child protection." C.R.'s attendance record did not improve, however, and K.F. withdrew C.R. from the fusion program in mid-April 2013 to move to Arkansas.

In fall 2013, having returned to Minnesota, K.F. enrolled C.R. in the same charter school's online-only program. K.F. testified that the switch to the online program was done at C.R.'s request. At K.F.'s request, the school removed the EBD designation from his IEP and reduced his special-needs services it was providing. During orientation, K.F. was provided with a student-parent handbook, which explained that the school measured attendance in its online program by the proportion of assigned work the student completes each week. As of February 21, 2014, out of 102 possible days' worth of attendance credit, C.R. had completed work earning only 41 days' worth of credit, the equivalent of 61 days absent. School staff notified K.F. by email of C.R.'s work-completion deficits. K.F. testified that C.R. often becomes agitated while working on his assignments, requiring that she give him breaks. Sometimes the breaks allow C.R. to

continue working, but sometimes he "shuts down." K.F. testified that C.R. "just needs time" to complete his schoolwork.

While in the charter school's online program, C.R. missed more than half of his scheduled telephone meetings with a social worker. K.F. attributed this to her lack of a personal phone and to C.R.'s reluctance to talk to the social worker. The social worker testified that C.R.'s lack of exposure to peers inhibits his progress. The guardian ad litem concluded that, based on C.R.'s "chronic absence from school" and the unsuitability of an online-only education program for C.R., "[h]e's not getting an education." He recommended that C.R. receive protective services from the county, noting K.F.'s "reluctance to cooperate" with school staff and child-protection officials.

On March 17, 2014, the district court adjudicated C.R. as a child in need of protection or services. It found clear and convincing evidence that K.F. "has failed to ensure C.R.'s regular attendance and/or progress in his schooling" and that these deficiencies are neither "excused by C.R.'s autism nor any failure by a school to make reasonable accommodations for C.R.'s disability." It found that repeated school transfers have "adversely impacted C.R.'s education" and his "ability to receive the appropriate services for his special needs." The district court also determined that K.F.'s claim that C.R. was completing additional schoolwork offline that was not recorded by the school's method for measuring attendance was "not credible," and it noted that K.F. had failed to take advantage of additional help offered by the school. It found that "C.R. has been deprived of an appropriate education by [K.F.] and is in need of protection." Accordingly, it ordered that C.R. be placed in K.F.'s home under the "protective

6

supervision" of the Ramsey County Community Human Services Department (RCCHSD).

**D E C I S I O N**

K.F. contends that the district court exaggerated the severity of C.R.'s attendance problems and failed to consider her efforts to provide him with an appropriate education. A district court may adjudicate a child as in need of protection or services when it finds that a child is being deprived of an education "because the child's parent . . . is unable or unwilling to provide [it]." Minn. Stat. § 260C.007, subd. 6(3) (2012). "Findings in a CHIPS proceeding will not be reversed unless clearly erroneous," meaning that the reviewing court is left "with the definite and firm conviction that a mistake has been made" or that the findings are unsupported by substantial evidence. *In re Welfare of B.A.B.*, 572 N.W.2d 776, 778 (Minn. App. 1998) (quotation omitted). But we "closely inquire into the sufficiency of the evidence to determine whether the evidence is clear and convincing." *Id.* (quotation omitted).

K.F. highlights the efforts she has made, beginning before C.R. was in kindergarten, to provide him with an education and to address his special needs. She asserts that her efforts demonstrate that the district court's conclusion is clearly erroneous. But "[a] child's absence from school is presumed to be due to the parent's . . . failure to comply with compulsory instruction laws if the child is under 12 years old and the school has made appropriate efforts to resolve the child's attendance problems." Minn. Stat. § 260C.163, subd. 11(a) (2012). The district court noted C.R.'s extensive record of absences and failures to complete schoolwork, continuing at the time of its

evidentiary hearing.  The district court also found that the charter school made reasonable accommodations for C.R.'s disability.  This record alone supports a CHIPS adjudication. *Cf. B.A.B.*, 572 N.W.2d at 777, 779 (concluding that 20 recorded absences—excused and unexcused—were sufficient to support a CHIPS adjudication).  The record also reveals that, although K.F. signed two agreements with school officials wherein she promised to ensure C.R.'s attendance, she failed to follow through on those commitments.

K.F. contends that the district court's finding that C.R. is failing to adequately progress in his online program is erroneous because "[i]t would appear that C.R. was paying attention somewhere because in the lessons he did complete his grades were better than average."  The district court explicitly found, however, that her claim that C.R. was completing work beyond that monitored by the school's attendance-monitoring method was not credible.  We defer to the district court's credibility determination. *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).   K.F. also does not challenge the district court's finding that "C.R. is not on-track to continue to the sixth grade" because of deficiencies in his completion of assigned school work.

K.F. also implicitly challenges the district court's assignment of responsibility to her for C.R.'s attendance problems and for the lack of services currently being provided to address C.R.'s special needs.  She criticizes the schools' use of the EBD designation, stating that this caused her to distrust the school system because it creates a "pathway to prison."  But she presents no evidence to contest the guardian ad litem's testimony that C.R.'s educational difficulties are "largely independent of what label he has on him."  She also cites no authority that a parent's subjective beliefs about the ancillary effects of

8

an EBD designation or distrust for the system excuses a parent from ensuring a child's attendance or from cooperating with a school's efforts to provide services. Even if the EBD designation was objectionable, it could not explain K.F.'s continuing failures to ensure that C.R. completes his assigned work or her failures to access the services that the charter school offered for C.R.'s special needs because, at K.F.'s request, the EBD designation was removed from C.R.'s IEP. The district court's conclusion that K.F. "chose not to avail herself and her son of services available through the school as well as RCCHSD" is well-supported by the record.

**Affirmed.**