*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0444**

In the Matter of the Welfare of the Children of: N. K. and R. F., Parents.

**Filed August 10, 2015
Affirmed
Reilly, Judge**

St. Louis County District Court
File No. 69DU-JV-14-687

Terri Port Wright, Cloquet, Minnesota (for appellant N.K.)

Mark S. Rubin, St. Louis County Attorney, Benjamin M. Stromberg, Assistant County Attorney, Duluth, Minnesota (for respondent St. Louis County)

Anne Roeser, Duluth, Minnesota (guardian ad litem)

Doug Osell, Duluth, Minnesota (guardian ad litem)

Considered and decided by Hudson, Presiding Judge; Schellhas, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REILLY**, Judge

Appellant-mother challenges the district court's adjudication of her children as children in need of protection or services (CHIPS), arguing that the record does not support the district court's findings and adjudication. We affirm.

**FACTS**

Mother, N.K., and father, R.F., have two children together: G.K., born June 29, 2009, and J.K., born September 26, 2012.[1]  On July 11, 2012, the St. Louis County Initial Intervention Unit (IIU) received a report that then three-year-old G.K. had not gained weight for five-and-a-half months and was losing weight, resulting in failure-to-thrive concerns. The report also stated that child protection services in Wisconsin had investigated reports of domestic violence, the home condition, and concerns that G.K. was not being fed.

A social worker met with mother, and mother began working with Extended Family Services in December 2012 due to her need for support and the birth of J.K. Mother's case plan included: parenting and housing assistance, basic home maintenance skills, transportation assistance, individual therapy, and arranging visits with father and the children. In January 2013, mother began receiving Intensive Family Based Services and Homemaker Services to assist her with parenting and household maintenance.

On October 28, 2013, a report alleged that mother left the children with a 13- or 14-year-old babysitter for a few days whose name mother did not know. When asked about the babysitter, mother told the social workers that she thought the babysitter was 16 years old and that the babysitter's mother also helped watch her children.  The report also alleged that mother did not always use car seats when transporting her children.

---

[1] Mother was the sole legal and sole physical custodian of G.K. and J.K.  Father did not participate in this appeal.

On January 29, 2014, IIU received a report that G.K. had bruises around her ankles. G.K. reported to a social worker that father bruised her ankle when he was mad. Father claimed that he lifted G.K. up by her ankles when they were playing and this action caused the bruise. Mother stated that father was playing too rough but that she did not see the injuries occur. The reporter informed IIU that father has a history of domestic violence, methamphetamine abuse, and anger issues and had recently put a hole in mother's apartment wall. Father described an incident in which he threw a lighter at the wall, causing a hole, after he and mother got into a fight. Mother retaliated by slapping father.

On August 18, 2014, IIU received several calls concerning mother's mental health and her ability to care for her children. After receiving these calls, social workers visited mother's apartment. While visiting mother, they learned that she voluntarily canceled her county assistance, canceled her housing assistance, and signed a notice to cancel her lease. Mother canceled her assistance and lease because she "believed that there was a new opportunity coming my way and then I was going to jump on that and, I don't know, felt it appropriate to take that risk. I believed everything was going to work out just the way it's supposed to work out." At the time, mother had just finished a job and had applied for a new job, but she had not yet interviewed for the new job. She had approximately $1,000 in savings to live off.

Also in August 2014, mother told multiple people that she was going to marry father on September 11, 2014. Mother bought a $500 wedding dress and asked a couple of the social workers for their addresses so she could invite them to the wedding. At this

3

time, father was attending mandatory anger management classes due to criminal convictions and had no plans to marry mother. Mother admitted that it was "probably not normal to tell people you are getting married on a specific day when you haven't worked that out with the person you are marrying." Additionally, mother told multiple people that she was pregnant. She stated that she took six negative home pregnancy tests but believed that she was pregnant because she had one positive pregnancy test and because G.K. told her that she was pregnant with twins.

Later the same month, G.K. was diagnosed with impetigo, a skin disease. G.K. was prescribed medication to treat the bumps on her face caused by the impetigo. At the time, mother would not give G.K. the medication because she believed that the doctor had misdiagnosed G.K. Mother believed that G.K. had a sexually transmitted disease after G.K. told her that a boy at daycare "put a bug on her face." Mother believed that the boy had put his penis on G.K.'s face and that G.K. had herpes.

The children were then removed from mother's home. Prior to the children's removal from mother's home, mother had not registered G.K. for kindergarten because she was going to homeschool G.K. A few weeks before the start of the school year, however, mother had not prepared for or had a plan in place for homeschooling.

In August 2014, respondent St. Louis County Public Health and Human Services Department (agency) filed a petition alleging that G.K. and J.K. were CHIPS. The petition alleged that "mother is struggling with significant mental health issues that are impacting her ability to make safe and appropriate decisions while caring for her

4

children. The mother has been receiving services for over two years to address these issues."

On February 9, 2015, the district court held a CHIPS trial and heard testimony from mother. The district court held that clear and convincing evidence exists for a finding that the children are in need of protection or services within the meaning of Minn. Stat. § 260C.007, subd. 6(8) (2014). The district court ordered the children to remain in the custody of the agency and ordered mother to comply with the reunification plan.

Mother appeals.

# D E C I S I O N

On appeal, mother contends that there is no evidence in the record to support the district court's conclusion that the children are in need of protection or services. In order to adjudicate a child as CHIPS, a district court must conclude that at least one statutory basis in Minn. Stat. § 260C.007, subd. 6 (2014), exists and that the child "needs protection or services as a result." *In re Welfare of Child of S.S.W.*, 767 N.W.2d 723, 732 (Minn. App. 2009). "Findings in a CHIPS proceeding will not be reversed unless clearly erroneous," meaning that the reviewing court is left "with the definite and firm conviction that a mistake has been made." *In re Welfare of B.A.B.*, 572 N.W.2d 776, 778 (Minn. App. 1998) (quotation omitted). But we "closely inquire into the sufficiency of the evidence to determine whether the evidence is clear and convincing." *Id.* (quotation omitted). "Considerable deference is due to the district court's decision because a district court is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

The district court concluded that the agency proved with clear and convincing evidence the statutory ground contained in Minn. Stat. § 260C.007, subd. 6(8). Under this statute, a child is in need of protection or services if the child "is without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of the child's parent." Minn. Stat. § 260C.007, subd. 6(8). Mother claims that the record does not support the district court's conclusion because it is "devoid of any evidence that the children were without proper parental care." The agency contends that although mother challenges the district court's conclusion, she does not claim that the facts are unsupported by the record.

In September and November of 2014, mother had a psychological evaluation. The agency submitted the evaluation report as an exhibit at the CHIPS trial. The psychologist reported that mother has schizophreniform, a mental disorder with symptoms similar to schizophrenia. The report explained that mother's

> current difficulties appear to be directly related to distortions of reality. Although religious beliefs typically do not constitute delusional content, she appears to be making decisions based upon those beliefs which would not be considered supported by the belief structure and/or rational thinking. Previous decisions have negatively impacted her financial and housing stability, as well as appear to have negatively influenced her ability to effectively integrate with medical services provided to her children.

The report suggested that mother's mental health concerns are lifelong and her current prognosis is "considered poor." The report recommended that mother attend individual psychotherapy and that she "consider a low dose of atypical antipsychotic medication."

6

Nevertheless, at the CHIPS trial, mother informed the district court that she had not filled the prescriptions for any of her prescribed medications. When asked if she believed that she had any mental health issues, mother responded: "Um, I'm not sure how I would explain that. I know I have mental health that can change from time to time. I don't really look at it as an issue." And when asked at the trial about her decision to leave her apartment and cancel her assistance, mother told the district court: "Well, I did go to business school for four years and a lot of business is, like, taking risks. And, you know, starting a small business you have to take risks, you have to put yourself out there and take a chance."

The record shows that although mother loves her children and wants to be a good parent, she does not fully comprehend the effect her mental health has on her role as a parent and her ability to make proper decisions about her children's care. Mother refused to treat G.K.'s impetigo and had not made the necessary arrangements for her schooling. The statements made to social services concerning mother's imaginary wedding and pregnancy coupled with the fact that she canceled her assistance and housing provided reasonable bases for the agency to intervene.

Based on the evidence in this record, the district court properly adjudicated the children as CHIPS within the definition of Minn. Stat. § 260C.007, subd. 6(8), due to mother's mental instability.

**Affirmed.**

7