*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1037**

In the Matter of the Welfare of the Children of: D. K. P., Parent

**Filed November 28, 2016
Affirmed
Connolly, Judge**

Steele County District Court
File No. 74-JV-16-542

Joel E. Eaton, Eaton Law Office, Owatonna, Minnesota (for appellant father)

Daniel A. McIntosh, Steele County Attorney, Sasha J. Zekoff, Assistant County Attorney, Owatonna, Minnesota (for respondent-petitioner Minnesota Prairie County Alliance)

Karie M. Anderson, Patton, Hoversten & Berg, P.A., Waseca, Minnesota (for respondent mother)

Julie A. Nelson, Owatonna, Minnesota (guardian ad litem)

Considered and decided by Connolly, Presiding Judge; Reilly, Judge; and Toussaint, Judge.*

_____

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**U N P U B L I S H E D   O P I N I O N**

**CONNOLLY**, Judge

Appellant challenges the involuntary termination of his parental rights to his two children, arguing that: (1) the district court erred in concluding that the termination petition made a prima facie showing that appellant caused the children egregious harm, so that efforts toward reunification of him and his children would be futile; and (2) the record did not support the findings that appellant cannot provide emotionally for his children and is palpably unfit to be a parent and that termination of appellant's parental rights is in his children's best interests. Because the termination petition does make a prima facie showing that appellant caused the children egregious harm and because the record supports the district court's findings, we affirm.

## FACTS

Appellant D.K.P. (father) and M.M. (mother) had a son, K., in November 2003 and a daughter, Z., in September 2005. Both children lived with M.M. in Oklahoma until December 2007, when K. was taken to Minnesota to live with appellant.

In October 2008, a child-protection report was filed stating that K., then four, was observed with a large bruise on his stomach that he said resulted from appellant hitting him with a belt. Appellant told the assessment worker that he hit K. eight times with the belt because his behavior was "out of control" and he "needed to be whooped" and appellant was angry with him. Appellant promised not to use corporal punishment again and to engage in parenting services, and K. was released to appellant's home. But in November 2008, appellant told a social worker that he would not accept parenting services because

2

he was "comfortable" with his parenting; he denied ever striking a child in anger; he disagreed with the view that the only acceptable physical discipline is striking a child with an open hand in a manner that does not leave a mark; and he said he would continue his disciplinary practice of striking K. with an object, telling him how many times he would be struck, and counting the blows to help K. learn to count. Appellant also said the bruise on K.'s stomach resulted from a fall at school, although he had previously said it resulted from appellant hitting K. with a belt. In December 2008, K. returned to live with M.M. and had no further contact with appellant for two and a half years.

In October 2009, appellant married K.M.P., a special-education case manager. They had a daughter, N., in September 2010. In 2011, an Oklahoma custody order gave appellant and M.M. joint legal custody of both their children, gave M.M. sole physical custody of Z., and gave appellant sole physical custody of K. By the end of 2011, both K. then eight, and Z., then six, were in Minnesota living with appellant, K.M.P., and N.

In June 2012, Z.'s summer-school teacher reported seeing bruises on Z.'s arm that Z. said resulted from appellant hitting her with a belt. Appellant later testified that he had bruised Z.'s arm while whipping her with a belt because she put her arm in the way.

In July 2012, a social worker, after talking to Z., met with appellant. Z. was present at the meeting in their home. Although Z. had said at school that she did not want to go home and clung to her teacher's leg when it was time to go home, she said at the meeting that she hated school and liked to be at home. Appellant had Z. demonstrate how exercise was used as a form of discipline; he said he spanked but did not abuse the children and again declined parenting-education services.

3

In December 2012, Z. reported during a bathroom break at school that her bottom hurt because appellant had injured her. The school nurse discovered a bloody gauze patch over a quarter-sized open wound on Z.'s buttock. Another child-protection report was submitted. A week later, Z. reported that a scabbed area on her shin resulted from appellant hitting her with his new paddle. She also reported being very hungry and not being allowed to eat the food sent home in the school backpack program. Z. said she did not want to go home because she was afraid of being punished with the new paddle with holes in it. Appellant later testified that this paddle existed and was one of several he used on the children.

In January 2013, the file was closed by the county worker who met with appellant and Z. and, in the district court's words, "decided this was a child behavioral problem and that [appellant] was 'a member of a disparaged population'"; "based [closing the file] largely on [appellant's] seemingly sincere representation he had changed his practices as a result of this report"; and apparently did not "ever attempt to verify whether there was any follow through by [appellant]." The district court also found that, although appellant claimed he and the children had begun therapy that was to "fix" the children so he would not "need" to use physical punishment on them, no records of any therapy were produced.

In February 2013, after approximately 14 months with appellant, K. and Z. went to Oklahoma to live with M.M. and their grandmother. In August 2013, a second daughter, C., was born to appellant and K.M.P. In April 2014, K.M.P. obtained an order for protection against appellant after he reacted to service of a dissolution petition by grabbing and spraining her wrist, blocking her retreat, and punching a wall.

4

In August 2014, after being away from appellant for 18 months, K. and Z. returned to Minnesota to live with him again. He told them there would be no more spankings but, during the next year and a half, appellant continued to spank both children with paddles or a belt, Z. more than K. After particularly severe spankings, Z. was required to sit in an ice bath that K. was required to prepare for her. K. later testified that he also had been required to sit in ice baths after beatings when he lived with appellant in 2012-2013.

On February 24, 2016, Z. was observed to be walking strangely and to be unable to sit comfortably in school. When asked about this, Z. first said that she could not talk about it or she and K. would not have a place to live and that she got in more trouble the last time she talked about it. Ultimately, Z. said that appellant had spanked her with a paddle the previous night and would spank her with the paddle again that night. A social worker photographed Z.'s injuries.

The next day, a social worker and the police chief met with Z., who said she had been hit more than 22 times two days earlier (February 23) and ten times the previous day. They spoke to K., who corroborated what Z. had said but was reluctant to give any information for fear that appellant would find out K. had talked. The police also visited appellant that day. He turned over to them the wooden cutting board he had used as a paddle to spank Z., on which he had made both children sign their names.

Appellant was arrested and arraigned on charges of malicious punishment and domestic assault, to which a charge of third degree assault—past pattern of child abuse was added. A Domestic Abuse No Contact Order (DANCO) was issued, and CHIPS petitions were filed on K. and Z.

In March 2016, respondent-petitioner Minnesota Prairie County Alliance filed a petition for the termination of appellant's parental rights to K. and Z. At a hearing on the petition, appellant's attorney made an oral motion challenging the "egregious harm" allegations in the petition. The motion was denied.

A trial was held in April 2016. It included testimony from the psychologist who had done a Parenting Capacity Assessment of appellant, which was admitted as an exhibit; the child protection case manager; and the guardian ad litem.

The Parenting Capacity Assessment was based on the psychologist's interviews of appellant and the children and on seven psychological tests of appellant. The report concludes that

> [appellant] does not appear to have the ability to parent the children to capacity and the risk for continued abuse would be high. In addition, there does not appear to be any bonding and attachment between the children and [appellant.] . . . The children have verbalized to numerous sources they do not wish to return to live with [appellant] and are extremely afraid that if they do have to return they will incur more abuse.

The psychologist recommended that "permanency for [K. and Z.] be established outside the custody of [appellant]."

The child protection case manager testified that she had not reviewed with the children a plan that involved their reunification with appellant because, when she talked about reunification, "they became uncomfortable and I did not want to continue making them uncomfortable." When asked if she had heard from other service providers, including those who provided foster care, that the children did not want to return to appellant and if she believed the children were sincere in stating that they did not want to return, she

6

answered, "Yes." When asked if it was in the children's best interest to wait and see if appellant could refrain from physical discipline for more than two or three months, as he said he had done before, she answered, "No."

The children's guardian ad litem testified, "I do not feel [the children] would be safe in [appellant's] home and given the testimony that I have heard throughout this proceeding, I do not think in the foreseeable future that they would be safe in the care of [appellant]" and said, "I do believe, given the testimony that I have heard here that a termination of parental rights is [in] the children's best interest with regard to [appellant.]" The guardian ad litem also testified that the children "have expressed a desire to not return to [appellant's] care" because "They're afraid. They don't trust him. . . . [T]hey've been promised before that things are going to change and they didn't. Their dislike for him [is] . . . strong dislike." When asked if she thought it was in the children's best interest to "wait and see if [appellant] can work on services and change", she answered, "I do not . . . [because t]hey have been doing that for years, waiting to see. . . . [R]ebuilding that relationship, I don't see that happening in anywhere near the foreseeable future."

In June 2016, the district court issued an order for termination of appellant's parental rights. The order included, among other things:

### FINDINGS OF FACT[1]

. . . .

57. [Appellant] testified at length. He holds certain immutable precepts: corporal punishment is the only way to keep his children out of prison. It is better to spank a child with an object so as to avoid the temptation to ball his fists. . . . In

_____

[1] The district court refers to K. as KP and to Z. as ZP.

7

his view, the prohibition on corporal punishment is a Minnesota cultural difference with which he does not agree. He does not want anyone telling him what to do. Spankings "make for understanding."

58. The extent of the paddling was such that [appellant] had gotten blisters from paddling the children. He then resorted to wearing gloves so the paddle would not slip, and also to protect his hand from splinters. [Appellant] was often oblivious to the children's pain and injuries, but took care to protect himself.

59. . . . [Appellant] admitted breaking one [paddle] on each of the two children. Nonetheless, he claimed the children were "oblivious" to the spankings. He attributed any crying the children did during the beatings as due to "hurt feelings or whatever," and pointed out that sometimes they cried even before he began paddling them. The spankings were not excessive in his view because they failed to correct the behaviors he sought to punish.

60. This testimony undermines the credibility of his later testimony that his February 23, 2016 "whoopin" of ZP was excessive, "very much so." The Court views the later statement as [appellant] saying not what he believes to be true but what he believes the Court wants to hear. While [appellant] testified that he had never hit ZP that hard before [February 23, 2016], he also testified that he "had control" during the beating. Even though he saw that [ZP] was limping after the beating and in his words "was greatly concerned", [appellant] still followed through the next night on his threat to spank her ten times every day because he "wanted her to fear that."

. . . .

63. [Appellant's] lack of insight into what is required of a parent was evident by the fact [that] he was untroubled by his lack of contact with the children for three years from 2009-2011. . . .

. . . .

65. [Appellant] denied his need for services [to improve his parenting] in 2008, twice in 2012, and now in 2016. . . .

. . . .

67. The Court is convinced [appellant] loves [h]is children but is also convinced he will not [accept] services except on his own terms, in his own time, if ever.

68. The evidence [and] testimony adduced at trial . . . demonstrate that the children have been seriously traumatized. . . . [T]heir recovery will take months at the very least. Neither

child wishes to see [appellant,] and their wishes are based on concrete evidence. Abiding by their wishes in this regard will assist the children in their recovery.

## CONCLUSIONS OF LAW

. . . .

12. . . . [Appellant] was given ample opportunities to address his parenting issues and declined services. While he was intermittently contrite during trial, he has professed to want to change his parenting style before, and that did not last. He still asserts that corporal punishment was the only thing that kept him out of prison, and the Court is not convinced that he would not apply this belief to KP and ZP again if given the opportunity. [Appellant] is an intelligent man, who . . . may well be able to learn sufficient parenting skills to be a safe parent [but expert] testimony . . . clearly indicated that would likely take more than a year, and the children cannot fairly be required to wait in limbo to see if [appellant] follows through on his own treatment needs, particularly in view of his lack of commitment to his own treatment needs up until the time of trial.

13. Additional or future services will not likely bring about lasting parental adjustment enabling [appellant] to care for KP and ZP within a reasonable period of time. There is clear and convincing evidence that [appellant] cannot safely parent the children now or in the foreseeable future.[2]

Appellant challenges both the district court's conclusion that the petition to terminate his parental rights made a prima facie showing that egregious harm had occurred to his children, so the county was not required to make reasonable efforts for reunification,[3]

_____

[2] Appellant does not really refute the district court's findings and conclusions, other than by expressing the views that the harm suffered by the children was not egregious and that, regardless of the statute to the contrary, parents who hit children with objects and cause them egregious harm are entitled to the county's efforts to reunite their families.

[3] Although the Notice of Appeal referred only to the June 2016 order terminating appellant's parental rights, appellant's brief also addresses the April 2016 order denying his motion for an order concluding that the petition did not make a prima facie case of egregious harm and that petitioner was therefore obliged to make reasonable efforts to

9

and its ultimate determination that termination of appellant's parental rights is in his children's best interests.

## DECISION

**1.   Did the district court err in concluding that appellant's children suffered egregious harm while in his care?**

"Reasonable efforts to prevent [out-of-home] placement and for rehabilitation and reunification are always required *except upon a determination by the court that a petition has been filed stating a prima facie case that: (1) the parent has subjected the child to egregious harm as defined in section 260C.007, subdivision 14.*" Minn. Stat. § 260.012 (a) (2014) (emphasis added). "Egregious harm includes, but is not limited to: . . . . (2) the infliction of 'substantial bodily harm' to a child, as defined in section 609.02, subdivision 7a; . . . [and] (6) conduct towards a child that constitutes assault under section 609.221, 609.222, or 609.223." Minn. Stat. § 260C.007, subd. 14 (2) (2014). The district court found that the petition established a prima facie case that appellant's children were subjected to egregious harm both by his inflicting substantial bodily harm on them and by his committing acts that constituted second-degree assault. We agree.

### A.   Substantial Bodily Harm

"'Substantial bodily harm' means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily member or organ . . . ." Minn. Stat. § 609.02, subd. 7a (2014).

---

prevent out of home placement and to encourage rehabilitation and reunification under Minn. Stat. § 260.012 (2014). In the interests of completeness, we address this argument.

The petition stated that, on February 24 and 25, a reporting party had seen Z. walk strangely and have difficulty sitting down and getting up. When asked, Z. had said (1) she was not supposed to talk about it and when she talked about a previous incident, appellant hit her more; (2) on February 23, he hit her with a wood paddle at least 22 times, then stopped counting; (3) he told her she would be hit with the paddle ten times every day for a year; (4) on February 24, he hit her ten times with the paddle; and (5) appellant sometimes used a belt instead of a paddle. After seeing the photographs of the injuries inflicted on Z. on February 23 and 24, the district court found that her injuries "would have made sitting and movement markedly painful."

K. was interviewed and said that: (1) he had seen appellant sit on Z. while hitting her with a paddle, or place his knee on her back;[4] (2) appellant sometimes tied the children to tables and hung Z. over a coat rack to prevent them from moving while he spanked them; (3) K. had sometimes been bleeding and bruised after appellant spanked him; (4) on November 28, 2014, K. received the worst beating of his life, being hit about 30 times with a paddle and "bruised up pretty badly"; (5) K. had been required to make ice baths for Z. to sit in; (6) once, when appellant was beating him with a belt, K. looked around to see if he was finished and was hit on the face by the belt; (7) on that occasion, appellant told K. to say he had been hit by a baseball bat; and (8) appellant also told both children to say they had just fallen if anyone commented that they seemed to be in pain.

---

[4] Appellant testified that he weighs 354 pounds and Z. weighs 78 pounds.

11

Appellant was interviewed about the events of February 23-24 and showed the officers the paddle he used, a cutting board. He said he thought he hit Z. about 20 times because the children are usually hit five times for lying or stealing and Z. had four instances of stealing candy or sweets; he also said that, after the children were severely beaten, he required them to sit in an ice bath for healing for no longer than 15 minutes.

The district court did not err in finding that the petition set out a primary case of egregious harm through the infliction of substantial bodily harm.

**B. Assault**

Second-degree assault occurs when one person assaults another with a dangerous weapon, Minn. Stat. § 609.222, subd. 1 (2014) (providing a penalty of not more than seven years imprisonment, a fine of not more than $14,000, or both), or assaults another with a dangerous weapon and inflicts substantial bodily harm, Minn. Stat. § 609.222 subd. 2 (2014) (providing a penalty of not more than ten years imprisonment, a fine of not more than $20,000, or both). The district court concluded that "[t]he [] paddles [appellant] struck KP and ZP [with] were dangerous weapons in the way they were used. The evidence of harm, especially ZP's injuries to her posterior, shows that [appellant] inflicted substantial bodily harm to the children." A dangerous weapon is "any . . . device or instrumentality that, in the manner it is used . . . is calculated or likely to produce death or great bodily harm." Minn. Stat. § 609.02, subd. 6 (2014). "It would be impossible to specify any and all objects capable of producing death or great bodily harm when used to inflict injury on another. Thus, by necessity, the definition of dangerous weapon in subdivision 6 must be expressed in flexible terms and be broad and inclusive." *State v. Graham*, 366 N.W.2d

12

335, 337 (Minn. App. 1985). Items determined to have been dangerous weapons when used to beat children include a wooden chair rung, s*ee State v. Elkins*, 346 N.W.2d 116, 119 (Minn. 1984), and a board measuring three feet by two inches by 3/4 of an inch. *See State v. Trott*, 338 N.W.2d 248, 250, 252 (Minn. 1983); *see also In re Welfare of Children of D.M.T.-R.*, 802 N.W.2d 759, 765-66 (holding that children struck with hands and a belt had suffered third-degree assault and experienced egregious harm).

The various paddles appellant used caused great bodily harm, including bruising, bleeding, and the inability to move or sit without pain. "Great bodily harm" includes "bodily injury . . . which causes a . . . protracted loss or impairment of the function of any bodily member . . . or other serious bodily harm." Minn. Stat. § 609.02, subd. 8 (2014). In the hands of a 354-pound man, the paddles were dangerous weapons when used to repeatedly strike children weighing 78 pounds (Z.) and 112 pounds (K.).

The district court did not err in determining that the petition made a prima facie case that appellant inflicted second-degree assault on his children.

Because the substantial bodily harm and second-degree assault inflicted on the children constituted egregious harm, the district court also did not err in denying appellant's motion for an order stating that the petition failed to make a prima facie case of egregious harm inflicted on appellant's children and concluding that the petitioner had no obligation to attempt the reunification of appellant with his children.

## 2. The Termination of Appellant's Parental Rights

"We review a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d

895, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). "Considerable deference is due to the district court's decision because a district court is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

This court will affirm a termination of parental rights "if at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, provided that the county has made reasonable efforts to reunite the family." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008) (citation omitted).[5] Submitting children to egregious harm is one ground for termination. Minn. Stat. § 260C.301, subd. 1(b)(6) (2014). In a thoughtful and detailed opinion, the district court concluded that appellant submitted his children to egregious harm. We agree.

We also agree with the district court's conclusion that there are three other statutory grounds for terminating appellant's parental rights: (A) appellant refused or neglected to comply with the duties imposed by the parent-child relationship, specifically not providing his children with what was necessary for their emotional health and development (Minn. Stat. § 260C.301, subd. 1(b)(2) (2014)); (B) appellant demonstrated his palpable unfitness to be a party to the parent-child relationship because of a consistent pattern of specific conduct toward his children, namely hitting them repeatedly with paddles or belts, that

---

[5] Therefore, although the termination of appellant's parental rights could be affirmed without addressing the district court's other grounds for termination, we address them in the interests of completeness.

renders him unable for the reasonably foreseeable future to care appropriately for their physical, mental, and emotional needs (Minn. Stat. § 260C.301, subd. 1(b)(4) (2014)); and (C) termination is in the best interests of appellant's children (Minn. Stat. § 260C.301, subd. 1(b)(7) (2014)).

### A.    Neglect of Parental Duties

The district court concluded that:

> 8. . . . [Appellant's in]ability to empathize with his children and to nurture them emotionally is amply demonstrated by his unwillingness to change his punishment regimen, even in the face of multiple injuries, multiple investigations, and multiple professionals explaining that physical punishment is not the answer.  Therefore, the Court finds petitioner has shown by clear and convincing evidence that [appellant] has been unable to provide emotionally for the children. . . .

The district court's findings as to appellant's testimony are supported by the record and support its conclusions.  Appellant concedes that he has "much to learn about how the physical abuse he has inflicted on the children has emotionally affected them," but claims that "he has never otherwise refused or neglected his parental duties."  Based on appellant's testimony, the district court noted that he has "done well in providing food and shelter to his children."  But nothing in appellant's testimony refuted the district court's conclusion that appellant is unable to provide emotionally for his children because of his repeated and consistent use of severe physical punishment, his ongoing belief that such punishment is necessary and beneficial to his children, and his refusals to accept parenting education that opposes that belief.

15

**B.  Palpable Unfitness to be a Party to the Parent-Child Relationship**

The district court concluded that, "Petitioner has established by clear and convincing evidence that [appellant] is palpably unfit to parent due to a consistent pattern of specific conduct, child abuse[,] and assault, which cannot be remedied in the reasonably foreseeable future." Appellant does not dispute the conclusion that he is palpably unfit to parent because there is a consistent pattern of his abusing and assaulting his children. He argues that "[t]he sole basis for any determination that [he] has been or will be an unfit parent is the abuse he has inflicted on the children" and his palpable unfitness cannot be a basis for termination because it has not been proved "by clear and convincing evidence that [appellant's] detrimental conduct will continue for a prolonged and indefinite period." But despite appellant's repeated promises, to his children and to several professionals, that he would stop using corporal punishment, his practice of spanking his children with a belt or a paddle that led to the first child-protection report on K., then age four, in October 2008 continued until the children, then 10 and 12, were removed from his care in February 2016. That conduct has already continued for a prolonged and indefinite period, and we agree with the district court's conclusion that it renders appellant palpably unfit to be a party to the parent-child relationship.

**C.  The Children's Best Interests**

The district court concluded:

> 11.  [Appellant's] interests and those of KP and ZP clearly conflict. [Appellant's] regime of excessive punishment for mostly minor offenses has traumatized the children. [Appellant's] zealous ideological commitment to harsh corporal punishment has blinded him to the real harm he has

16

> inflicted and would likely continue to inflict without intervention. KP and ZP have an interest in a safe, nurturing home where they do not live in fear of beatings so harsh that they require ice baths for infractions as minor as taking a piece of candy. These interests vastly outweigh [appellant's] interest in retaining the children . . . .

In termination proceedings, "[w]here the interests of the parent and child[ren] conflict, the interests of the child[ren] are paramount." Minn. Stat. § 260C.301, subd. 7.

Appellant argues that notwithstanding "the testimony at trial about the children not wanting to see their father," the children "have an interest in maintaining a relationship with a parent who loves them and can provide for them." But appellant offers no evidence that either of the children wants to maintain a relationship with him, and both K.'s testimony and Z.'s conduct when she saw appellant during the trial (she dived to the floor to be out of his sight) indicate that they do not want such a relationship. Moreover, the trauma evaluator, the guardian ad litem, and the parenting evaluator all testified that the children do not want to be and should not be reunited with appellant; appellant does not address these professionals' opinions.

It is in the best interests of K. and Z. that appellant's parental rights to them be terminated. We affirm the termination.

**Affirmed.**