*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0532
A16-0616**

In the Matter of the Welfare of the Children of:
L.T.P. and L.V.J.,
Parents

**Filed October 24, 2016
Affirmed
Bratvold, Judge**

Crow Wing County District Court
File Nos. 18-JV-15-4304
18-JV-15-751

Charles D. Halverson, Halverson Law Office, Brainerd, Minnesota (for appellant L.V.J.)

John P. Chitwood, Full Circle Law, St. Paul, Minnesota (for appellant L.T.P.)

Raymond T. Horton III, Horton Law Office, Aitkin, Minnesota (for respondents K.V.J. and L.V.B.J)

Donald F. Ryan, Crow Wing County Attorney, Janine LePage, Assistant County Attorney, Brainerd, Minnesota (for respondent Crow Wing County); and

Eli Loven, Pequot Lakes, Minnesota (guardian ad litem)

        Considered and decided by Connolly, Presiding Judge; Larkin, Judge; and Bratvold, Judge.

UNPUBLISHED OPINION

**BRATVOLD**, Judge

Appellants L.T.P. (mother) and L.V.J. (father) challenge the termination of their parental rights in this consolidated appeal. The sole issue raised by mother is that her purported waiver of counsel was not voluntary and intelligent and that, in light of her mental capacity, the district court failed to adequately examine her after she stated she wanted to proceed without counsel. Father argues that the record does not support the district court's determinations that: (a) he failed to satisfy the duties of the parent-child relationship; (b) he failed to correct the conditions leading to the out-of-home placement; (c) the children have been neglected and are in foster care; (d) the county has made reasonable efforts to reunify the family; and (e) termination of his parental rights is in the children's best interest.

Because the district court did not err in determining that mother had waived the right to counsel, we affirm the termination of mother's parental rights. Regarding father, because clear-and-convincing evidence establishes that the statutory criteria to terminate parental rights were met, reasonable efforts were made by the county to reunify the family, and termination is in the children's best interests, the district court did not abuse its discretion in terminating father's parental rights and we affirm.

## FACTS

Mother and father are the parents of seven minor children, ranging in age from 5 to 17-years old. Mother and father are also the parents of S.T., who is an adult and not involved in this appeal.

Mother and father began their relationship in 1996 and lived together on and off until 2010, but were never married. By 2005, father was aware that mother had a significant alcohol problem and had assaulted the children. They had four children before 2005 and four children after 2005. Father testified that mother's alcohol problem "got worse" over time, beginning in 2007 or 2008.

It is unclear from the record where mother and father lived during their early relationship, but sometime in 1999, they moved to Cedar Rapids, Iowa, where they remained until 2008. Mother and father ended their relationship in 2010, when father was incarcerated in Illinois. Mother was then living in Minnesota. After father's release from prison, he moved to Chicago, Illinois. Mother and the children moved several times between 2010 and 2015, alternating between Minnesota, Illinois, and Indiana.

In 2011, while mother was living in Indiana, the state initiated child protection proceedings because she abandoned S.T. and K.V.J., who were 14- and 12-years-old at the time. Indiana did not consider father to be an option for placement because he had not been adjudicated the father of any of the children, although he was listed as a "participant" in the Indiana proceedings. The children were in foster care from 2011 until 2013, when Indiana returned the children to mother.

In 2014, while mother was residing in Indiana with the children, S.T. and K.V.J., who were 17- and 16-years-old at the time, visited father in Chicago. During S.T.'s and K.V.J.'s absence, mother and at least five of the children, were in a serious car accident. One child, L.V.J., who was age 9 at the time, suffered serious injuries and required hospitalization. Father stayed with L.V.J. during her weeklong hospital stay; the child

returned home with mother upon her release. Sometime after the car accident, K.V.J. returned to Indiana with mother, but S.T. remained in Chicago with father, which is where S.T. lives today as an adult.

In December 2014, mother and five children moved to Minnesota, where they did not have permanent housing for approximately five weeks. The two children who did not come to Minnesota stayed with family friends in Indiana. In February 2015, after the other two children joined them, mother and all seven children moved into a house in Brainerd.

On February 17, 2015, K.V.J., age 16, and his siblings locked themselves in a room because mother was intoxicated and they were afraid. Mother "pounded on the door" and demanded that K.V.J. open it. When K.V.J. opened the door, mother assaulted K.V.J. with a dinner fork, leaving visible injuries on the left side of his neck. Two days later, police received multiple 911 hang-up calls from mother's house. Police responded to the home and found mother to be "incoherent, hysterical, and drunk" and saw the injuries on K.V.J.'s neck. After discovering how K.V.J. was injured, Crow Wing County Social Services ("the county") placed the children on a 72-hour hold.

On February 20, 2015 the county filed a child in need of protection or services (CHIPS) petition for the seven children. The county received temporary custody and the children were placed in foster care. During the initial weeks of placement, the children disclosed additional instances of physical abuse by mother, including that they were beaten with belts and that their bodies bore marks from these incidents. The children had been "traumatized by the abuse," the "unstable living situations," and were in significant need of services.

4

After the July 2015 CHIPS trial, the district court found that mother "had a history of [chemical] and child abuse problems" dating back to 2005. These problems included: abusing marijuana during pregnancy, resulting in L.V.J., Jr. being placed in foster care shortly after his birth; hiding alcohol around the house; hitting a child in the head with a spatula and causing "a big gash to his head"; and hitting father in the head with a blow dryer placed inside of a sock. In August 2015, the children were adjudicated in need of protection or services.[1]

After the CHIPS proceeding, the county "took the unusual step" of assigning two social workers to this case; one to work with the parents, and one to work with the children. As a result, the county provided mother, father, and the children with an array of services including, but not limited to: foster care placement; supervised visitation; mental health services for the entire family; random drug testing; transportation services; relative search services; educational services for the children; and case management services.

Before the CHIPS trial, the county expedited an interstate compact home study (ICPC) to determine whether father was a placement option. The ICPC, which received information from the Illinois Department of Child and Family Services, recommended that the children not be placed with father. The ICPC stated that father lacked sufficient housing for seven children, could not drive and did not have a means of transporting all of the children to obtain needed services, had stated that he would not participate in case planning, and did not believe the children needed services. While the ICPC stated that the county

_____

[1] In the termination trial, the district court took judicial notice of the CHIPS proceedings, in particular, the orders, adjudication, and disposition.

would complete another home assessment, this never happened because father was noncompliant with his case plan.

In fact, as was determined by the district court based on evidence at the termination trial, neither parent cooperated with the county or complied with their case plan. Mother's case plan, adopted by the district court on December 10, 2015, required her to abstain from chemical use, complete inpatient chemical dependency treatment, follow aftercare recommendations, submit to random chemical use testing, participate in individual therapy, complete mental health testing, develop empathy for her children, and demonstrate an understanding of the children's needs.

Father's case plan, also adopted by the district court, required father to complete a psychological assessment and follow recommendations, obtain and keep employment, provide the county with all locations where he had previous criminal charges, sign all necessary releases of information to coordinate services, assist the county in a relative search, and maintain appropriate contact with the children as set up by the county. The evidence presented at trial established that father completed his evaluation in Brainerd on July 16, 2015. The recommendations included that father participate in anger management, begin in-home counseling, cooperate with random chemical testing, prepare a written plan for the children's placement with him, and "clean up" his Facebook page because it contained violence and nudity that was accessible to three of his children.

Because mother and father did not follow their case plans, the county filed a termination of parental rights petition. Father requested bifurcated proceedings, but the district court denied this request and tried the petitions together. During the January 2016

trial, the district court heard testimony over six days, including from three therapists and three social workers who opined that six of the seven children have a range of mental health issues and cognitive disabilities.

On February 10, 2016 the district court issued detailed findings of fact, conclusions of law, and order directing the termination of each parent's rights to all seven children. The district court found that the children had been traumatized by abuse and neglect, needed long-term services, and needed "permanency established as soon as possible." The district court also found that the children's current foster care providers were "the best chance the children have ever had" for "healthy, ongoing permanency."

The district court found that mother has continued to abuse alcohol, resisted participating in the treatment program, minimized her actions, and denied that she has alcohol, mental health, or domestic violence problems. Also, mother left treatment and refused to live in a halfway house, against staff advice. On at least three occasions, mother refused to participate in individual therapy. When mother did finally enter individual therapy, she was unable to set goals for herself, and refused to discuss her children, the child protection case, or any related events. The district court found that mother denies she has ever been abusive to any of the children, "despite the existence of overwhelming evidence that she has repeatedly physically abused her children." The district concluded that mother "is palpably unfit" as a parent based on clear-and-convincing evidence of continuing alcohol and domestic abuse against the children in a consistent pattern that is of a duration and nature that she is unable to care appropriately for the children's physical, mental, or emotional needs.

The district court also found that clear-and-convincing evidence established that father "substantially, continuously, and repeatedly" refused and neglected his parental duties by failing to take reasonable steps to protect the children from mother's alcohol and physical abuse and by being "entirely absent from the children's lives for substantial periods of time."

The district court concluded that the evidence "clearly and convincingly establish[ed]" that the rights of both parents should be involuntarily terminated because, among other statutory grounds, they continuously "refused and neglected to comply with the duties imposed . . . by the parent and child relationship"; reasonable efforts "failed to correct the conditions leading to" the children's placement; and the children were neglected and in foster care. The district court also determined that the county made reasonable efforts to reunify the children with their parents and that termination is in the best interests of the children. Accordingly, the district court directed the state to assume legal guardianship and custody for all seven children for adoptive placement. Following father's motion for amended findings and new trial, the district court conducted a hearing and denied the post-trial motion. This appeal followed.

**A.      Facts Specific to Mother's Waiver of Counsel**

In October 2015, just over two months before trial on the termination petition, mother's attorney asked the district court to be discharged, because there had been an "irretrievable breakdown in the . . . relationship." The court granted the request, and appointed a new attorney.

8

The trial on the termination petition began on January 4, 2016, and lasted six days. On the second day of the trial, mother failed to attend court, and the trial proceeded in her absence but with her attorney present. The district court heard testimony from a licensed therapist that mother had an intelligence quotient (IQ) of 71, which is in the "borderline range of intellectual functioning." Mother's attorney did not object to this testimony because he had stipulated to her IQ. On the third day of trial, mother told the district court that she no longer wanted her attorney's representation and requested that her attorney be discharged.

Before responding to mother's request, the district court asked her a number of questions to determine whether she understood, as follows: that the district court would not appoint another attorney for her; that the district court would not treat her differently because she did not have an attorney; and that she would be expected to comply with the rules of procedure and evidence if she represented herself. The district court also inquired whether mother understood the nature of the termination proceedings and the evidence and legal standards involved in terminating her parental rights. The district court additionally asked mother whether she understood her attorney's role and specifically asked mother four times if she was sure she wanted to discharge her attorney. The district court further asked mother whether she understood that it would be impossible to hire another attorney for the trial. Mother responded affirmatively to each of the judge's inquiries.

The district court granted mother's request to discharge her attorney. After that, mother represented herself. As the trial proceeded, mother objected to some exhibits and

9

did not object to others; similarly, mother cross-examined some witnesses and did not cross-examine others. Mother declined to make a closing argument.

### B. Facts Specific to Father

As already mentioned, father's case plan required that he complete a psychological assessment and follow recommendations. The completed assessment report stated that father did not have a "realistic understanding regarding the children's special needs," because he believed that if the children were placed in his care, they would behave significantly better. The report concluded that father loved his children, and stated it would be appropriate to reunite the children with father if he completed anger-management and in-home family counseling and if he could demonstrate an adequate understanding of the children's special needs and show that the children would receive necessary services while in his care. The report, filed on July 16, 2015, required father to contact the county regarding the children's needs. On August 6, 2015, the psychologist wrote an addendum to the report, stating that father had not yet contacted the county, he suspected that some of father's representations were inaccurate, and he was concerned that father did not appreciate the children's needs. The addendum concluded that father should develop a written plan regarding how each child would receive necessary services should the children be reunited with him.

When either of the two social workers attempted to contact father by telephone or in person, he refused to cooperate and was "abrasive, oppositional, and defiant." In mid-August 2015, father restricted his communication with the county to email only. In total, the county attempted written contact with father 54 times. By December 2015, the county

reported to the district court that father was not following his case plan and had refused to cooperate. Both social workers and the guardian ad litem "advocate[ed] termination of both parents' parental rights."

At some point just before trial, one of the social workers had "additional personal interaction" with father, and she "change[d] her position," recommending in her testimony that the permanency determination be extended for 90 days to give father an "opportunity to show he could meet his children's needs." The testimony of the other social worker and the guardian ad litem disagreed with this recommendation.

Other trial testimony included a county case aide, who stated the children and father displayed positive interactions in the visits, and that father should be involved with the children's lives to provide a role model for them on cultural and racial issues. The children's' therapists testified that the children preferred to stay in their foster placements, and moving the children now was likely to disturb the children's progress in making attachments with their foster families, and for at least two children, their progress in controlling their emotions. The district court also heard testimony from the children.

Father testified that he is committed to his children and that he violated parole by coming to Minnesota without permission for court proceedings and visits. Father admitted that he knew about the abuse the children had endured, but stated that he told the children he did not want to hear any more because it was "too much," and that he "dismissed" the children's reports of abuse because he wanted to make sure they were telling the truth. Father testified that he made one report to child protective services in Indiana, and that the state did not follow up. When asked about the incident where mother assaulted K.V.J. with

11

a dinner fork, father testified that he told K.V.J. to keep the children away from mother because "that's how we normally deal with [mother] when she's drinking."

Regarding the children's need for services, father presented a handwritten plan regarding the schools and services the children would be enrolled in if they were reunited with him. Finally, father admitted during his testimony that most of his case plan remained unfinished because he failed to cooperate with the county during the CHIPS proceedings.

In addition to the findings already mentioned, the district court found that while father loves his children, he has "not come close" to being a sustained and stabilizing presence in his children's lives. The district court specifically considered and rejected father's claim, based on the social worker's testimony, that father had been treated unfairly and any failures were due to cultural barriers. The district court found father's explanation "uncompelling" because he was "combative and uncooperative" with social workers and, over time, father's explanation is a "pattern" of refusing to take responsibility for his own decisions or unfavorable outcomes. The district court also found that the handwritten plan provided by father was "essentially meaningless" because father also testified that he prepared the plan when he did not understand the children's needs. The district court concluded that father's absence and failure to protect the children directly resulted in the children living in "undesirable" situations that traumatized them and prolonged their "high need for services."

**D E C I S I O N**

**I.**     **The district court's determination that mother voluntarily and intelligently waived her right to counsel was not clearly erroneous.**

Mother raises two challenges to the district court's decision to discharge her second attorney, relying on *State v. Camacho*, 561 N.W.2d 160 (Minn. 1997), for the premise that heightened scrutiny is required when someone with a diminished IQ waives the right to counsel. First, mother argues that the district court should have used the procedures required when a defendant waives the right to counsel in a criminal case. Second, mother argues that the record does not support the district court's determination that she voluntarily and intelligently waived her right to counsel in this case. We discuss each argument in turn.

This court reviews a district court's finding that an individual voluntarily and intelligently waived the right to counsel for clear error. *In re Welfare of G.L.H.*, 614 N.W.2d 718, 723 (Minn. 2000); *see also* Minn. Stat. § 260C.163, subd. 3 (2014) (setting forth a parent's right to counsel at county expense in juvenile court proceedings). "A finding is clearly erroneous if it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660–61 (Minn. 2008) (quotation omitted). "[T]he validity of a parent's waiver of [the] statutory right to counsel in [termination] proceedings can be determined by examining the surrounding circumstances of the case." *G.L.H.*, 614 N.W.2d at 723.

First, regarding what procedure is required, mother cites *Welfare of G.L.H.*, but she does not discuss the holding, which we conclude is dispositive. In *Welfare of G.L.H.*, termination proceedings began because the mother had abandoned her children and was

13

chemically dependent. 614 N.W.2d at 719. Immediately before the trial, the mother dismissed her public defender. *Id*. The district court "repeatedly asked respondent if she was certain" that she wanted to dismiss her attorney, "and she responded affirmatively." *Id*. After the trial, the district court found that it was in the children's best interests to terminate the mother's parental rights. *Id*. at 720. This court reversed, stating that the right to counsel in termination proceedings was analogous to that of criminal defendants. *Id*.

The supreme court disagreed, holding that the right to counsel in termination proceedings "does not necessitate the application of the procedure set forth" in the criminal rules. *Id*. at 723. Moreover, the supreme court noted that "[a]n analogy between waiver of the right to counsel in TPR proceedings and in criminal proceedings fails to recognize that the creation of a statutory right is not necessarily the equivalent of a constitutional right." *Id*. at 722. The supreme court affirmed the district court's determination, concluding the mother's waiver was voluntary and intelligent because she had the benefit of an attorney for over a year, understood she would have to represent herself and cross-examine witnesses, knew "the nature and consequences of the TPR trial," and she was aware that neglect and drug abuse were "the grounds" for the termination petition. *Id*. at 724.

Because *Welfare of G.L.H.* held that waiver of counsel in termination proceedings does not require the same procedures as in criminal proceedings, the application of *Comacho* is not required because it involved criminal proceedings. Also, the district court was well aware of mother's IQ, because it heard testimony regarding her intellect and considered this fact in granting mother's request to discharge her attorney. Thus, the district

14

court did not err in the procedures it used as it considered mother's request to discharge and waive counsel.

Second, regarding the district court's waiver determination, we examine the surrounding circumstances of the case to determine whether mother's waiver was voluntary and intelligent. *Id*. at 723. Here, the district court carefully considered mother's request to discharge her attorney, as reflected in over five pages of discussion in the transcript. The district court implicitly found a voluntary and intelligent waiver when it granted her request after asking mother four times if she wanted to discharge her attorney and represent herself. Mother responded yes to each inquiry. Importantly, after learning that mother wanted to discharge her attorney because he told her about the IQ evidence, the district court explained to mother that her attorney did not determine her IQ and mother stated she understood, but still wanted to discharge her attorney. Additionally, mother cross-examined witnesses during the termination trial, and the questions she asked show that she understood the nature and consequences of the trial. Moreover, mother had two different attorneys, was represented for eleven months, and the district court informed mother that she would not be treated any differently because she did not have an attorney.

Because the circumstances surrounding this case show that mother understood the consequences of representing herself, and voluntarily decided to discharge her attorney, the district court's determination that mother voluntarily and intelligently waived her statutory right to counsel is not clearly erroneous.

**II.     The district court's finding that father's parental rights should be terminated was not clearly erroneous.**

There is a "presumption that a natural parent is a fit and suitable person to be entrusted with the care of [their] child." *In re Welfare of A.D.*, 535 N.W.2d 643, 647 (Minn. 1995). "Ordinarily, it is in the best interest of a child to be in the custody of his or her natural parents." *Id.* Therefore, "[p]arental rights are terminated only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990).

In a proceeding to terminate parental rights, the county "bears the burden of producing clear[-]and[-]convincing evidence that one or more of the statutory termination grounds exists." *In re Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988). We will affirm the district court's decision to terminate parental rights if at least one statutory ground for termination is supported by clear-and-convincing evidence, termination is in the best interests of the child, and the county has made reasonable efforts to reunite the family. *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396–97 (Minn. 1996).

On appeal, this court determines whether the district court's findings addressed the statutory criteria and whether those findings are supported by substantial evidence and are not clearly erroneous. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). We also review for an abuse of discretion the district court's determination of whether a particular statutory basis for involuntarily terminating parental rights is present. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 985, 901. This court defers to a district court's credibility determinations, because the "district court is in a superior position" to make judgments regarding credibility of witnesses. *In re Welfare of the Child of D.L.D.*, 771

16

N.W.2d 538, 545 (Minn. App. 2009); *L.A.F.*, 554 N.W.2d at 396. A district court's decision in a termination proceeding must be "based on evidence concerning the conditions that exist at the time of termination." *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007) (quotation omitted).

**A.    The district court did not err in determining that father failed to comply with the duties imposed by the parent-child relationship.**

Father argues that clear-and-convincing evidence does not exist to support the involuntary termination of his parental rights. The district court found clear-and-convincing evidence existed and terminated father's parental rights on three separate statutory grounds, the first of which was that father failed to comply with the duties imposed by the parent-child relationship. A juvenile court may terminate parental rights if the court finds that "the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship." Minn. Stat. § 260C.301, subd. 1(b)(2) (2014). This includes providing the child with "food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development . . . ." *Id*. The parent must be "physically and financially able" to provide this care, and reasonable efforts by the county must have failed to correct the conditions leading to the placement. *Id*.

The district court found that father had not maintained a presence in the children's lives and had not worked toward completing his case plan. The district court rejected father's recent claim of a change of heart regarding his children's needs, noting that it came too late to benefit the children. The district court specifically found that father could have

17

protected the children from the abuse he knew was occurring, but chose not to. For example, the district court found that father never sought any legal rights as a father and knew of mother's chemical abuse and neglect, but continued to father children with her, and made no "serious effort to protect his existing children." Additionally, when S.T. and K.V.J. lived with father in March 2014, he could have taken them to child protective services in Indiana to report that the children in mother's care were in danger of being physically abused and neglected, but he did not do so.

Failure to comply with a court-ordered case plan is "evidence of a parent's noncompliance with the duties and responsibilities" imposed by the parent and child relationship. *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 666 (Minn. App. 2012). This point is illustrated in *In re Child of Simon*, which involved termination of a father's parental rights after the mother voluntarily consented to termination of her rights. 662 N.W.2d 155 (Minn. App. 2003). After the father was released from prison, he developed a case plan with social services. *Id*. at 158. Although the father understood the case plan, he missed an appointment and never rescheduled it. *Id*. The father did not respond to attempts by the county to contact him, and he admitted that he did not comply with the provisions of the case plan *Id.* at 158–59. This court affirmed termination on three separate statutory grounds, including the father's failure to comply with the duties of the parent-child relationship. *Id*. at 163–64.

Similar to the father in *Simon*, this father also failed to complete a majority of his case plan, which is "evidence of his lack of compliance with the duties and responsibilities of the parent-child relationship." *Id*. Here, father completed a psychological assessment,

but he failed to follow through with the recommendations. Further, he refused to participate in individual therapy, sign and return necessary releases of information, and failed to respond to 54 written attempts to involve him in case planning. Additionally, father was asked in August 2015 to provide a plan that outlined how his children would receive the services that each of them needed if they were reunited with him, and he failed to produce that plan until just before trial in January 2016. Notably, after he produced that plan, he admitted that he was unaware of the level of services his children required.

Father argues that being on parole hindered his ability to comply with his case plan. The district court found, however, that father was an intermittent presence in the children's lives because: (a) he was completely absent for a one-year period from early 2010 to early 2011; (b) K.V.J. testified that father was "in and out of jail" ever since "[he] was little"; (c) up until 2013, father was absent from the children's lives for "significant periods of time"; and (d) at best, father was a "weekend dad" when he did exercise parenting time with the children. In short, the district court found that father's absences were due to "his own poor choices." Because of his prolonged absences, father has failed to parent the children. *See Simon*, 662 N.W.2d at 163 (stating that failure to meaningfully parent a child is evidence of the failure to comply with the duties of the parent-child relationship).

On this record, the district court's findings that father was largely absent from the children's lives, failed to complete his case plan, and failed to protect the children from mother's abuse and neglect were supported by clear-and-convincing evidence and were not clearly erroneous. Thus, the district court's finding that father failed to comply with the duties of the parent-child relationship was not an abuse of discretion. Because this court

19

affirms the district court's finding on this ground, it declines to address the remaining two statutory grounds on which father's parental rights were terminated.

### B. The district court did not err in finding that the county made reasonable efforts to reunify the children with father.

In a termination case, the county must make reasonable efforts to reunify the family. Minn. Stat. § 260.012(a) (2014). Father argues that the district court erred in finding the county made reasonable efforts to reunify him with his children, although he provides no specific examples of which services were unreasonable or what further services would have made a difference in this case.

This court reviews a district court's finding that a county made reasonable efforts to reunify the parent with the child for clear error. *Children of J.R.B.*, 805 N.W.2d at 901 (stating this court reviews district court's findings of fact for clear error). The district court must make "specific findings" and ensure that the county made reasonable efforts "to prevent placement or to eliminate the need for removal and to reunite the child with the child's family." Minn. Stat. § 260.012(a) (2014); Minn. Stat. § 260C.301 subd. 8(1) (2014). "When determining whether reasonable efforts have been made, the court shall consider whether services . . . were: (1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h). "The reasonableness of the efforts can be evidenced by the quantity and quality of the assistance provided to the family." *In re Welfare of J.S.*, 470 N.W.2d 697, 703 (Minn. App. 1991) *review denied* (July 24, 1991).

Here, the district court found that reasonable efforts were made by the county. On similar facts, this court in *Children of J.R.B* affirmed the district court's determination that reasonable efforts were made where the county had completed a psychological evaluation of the mother, and "counseling, aftercare, urinalysis, a rule 25 chemical dependency assessment, parenting classes and other services were available to the mother." 805 N.W.2d at 903. For the father, this court affirmed the district court's finding that the county made reasonable efforts because the father "did next to nothing to attempt to get his children back." *Id.* at 904. This court concluded that the father's failure to respond to the county's efforts to engage him meant that a detailed analysis of the county's efforts was unnecessary. *Id.* Importantly, the district court had outlined all of the county's attempts to engage father in case planning, including meetings, "at least five" telephone calls, and "a dozen letters." *Id.*

The circumstances in *Children of J.R.B.* are almost identical to the circumstances in this case. The mother in *Children of J.R.B.* was chemically dependent, the father had been incarcerated, was on parole, and had been an intermittent presence in the children's lives. *Id.* at 898. Similar to the county's efforts in *Children of J.R.B.*, the county's efforts in this case include psychological assessments for both parents, a rule 25 assessment for the mother, random chemical testing for both parents, mental health and educational services for the children, parenting classes, individual therapy referrals for the parents, as well as assistance with foster care placement, a relative search, and an ICPC home study and transportation services for the father. Thus, the district court had ample evidence

21

supporting its determination that reasonable efforts had been made by the county in Indiana, as well as by the county in Minnesota.

Additionally, the district court found that father refused to cooperate in the services offered and father testified on direct-examination that his case plan remained largely incomplete. He failed to respond to 54 written contacts sent by the county to engage him in case planning. Therefore, under the standard articulated in *Children of J.R.B.*, this court need not conduct a detailed analysis of the services offered by the county because father failed to respond to the county's efforts to engage him.

Father appears to argue that the services provided were not culturally appropriate under Minnesota Statute section 260.012(h), although he gives no examples. This court notes that while mother, father, and the children are African-American, the agency was unable to place the children with African-American families in Crow Wing County. Additionally, a social worker testified that some of the children had stated that they were the only black children in their classes, but she also said that they had no trouble making friends and that all of the children "loved" their schools. The social worker also testified that the children's foster parents were learning about skin- and hair-care to help the children with these needs. Based on our review, the record establishes the district court properly considered whether the services provided were culturally appropriate.

In sum, substantial services were offered to father, including transportation services to assist him in coming to Minnesota for visits. Because father was oppositional, defiant, and unresponsive to the social workers, the district court's finding that reasonable efforts

22

had been made to reunite the family was supported by clear-and-convincing evidence and was not clearly erroneous.

**III. The district court did not err in finding that termination is in the best interests of the children.**

Father argues that clear-and-convincing evidence does not support the district court's finding that termination of his parental rights is in the best interests of the children. Specifically, father argues that the testimony of a social worker and county case aide that the children should have contact with their father contradicts the district court's decision that termination is in the children's best interests.

This court reviews a district court's "ultimate determination [that] termination is in a child's best interests for an abuse of discretion." *J.R.B.*, 895 N.W.2d at 901, 905. "If the district court finds . . . at least one statutory basis to terminate parental rights, the best interests of the child must be the paramount consideration in deciding whether to" terminate those rights. *J.R.B.*, 805 N.W.2d at 905 (quotation omitted). The district court must balance three factors in making the best-interests determination: "(1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *Id*. "[I]f there is a conflict between the interests of a parent and a child, the interests of the child are paramount." *J.R.B.*, 805 N.W.2d at 905 (quotation omitted).

23

The district court found that termination of father's rights is in the best interests of the children. The district court relied on evidence that father knew about the physical abuse but did nothing to alleviate it, the children have extensive mental health and cognitive needs caused by years of abuse, and, without immediate intervention, the children's problems will worsen. Father's failure to comply with his case plan and learn about his children's special needs also informed the district court's findings.

Regarding the first best-interests factor, some of the children discussed their preferences with the district court judge. K.V.J. testified that he wanted to see his father, and that he thinks his father should be able to see the children. K.V.J. also testified that it was *not* in his best interests to be returned to his father, and that he has concerns that his father could not parent all of the children. L.V.J. testified that she did not want to be "split up" from her father or have him "lose his rights." K.V.J., L.V.J., and L.V.J., Jr., each testified separately that they felt safe with their father.

Regarding the second factor, father has testified about his interest in preserving the parent-child relationship. Father testified that he would like all of his children to live with him. The district court, however, found that father's actions contradicted his assertions. Father conceded at trial that he was noncompliant with his case plan and had a change of heart during the course of the termination trial. The district court found that, in August 2015, the county directed father to provide a plan that described how the children would receive services if they were returned to him; however, father did not respond with a plan until trial began in January 2016. As a result the district court found that, while father loves his children, his change of heart was "too little, too late."

Regarding the third factor, the district court heard testimony about the competing interests between the children's and father's preferences and the children's needs. While one of the social workers supported extending permanency proceedings for 90 days, the children's social worker, guardian ad litem, and therapists stated that the children need permanency and the proceedings should not be extended. After weighing this evidence, the district court found, by clear-and-convincing evidence, that extending the proceedings "would be contrary to the children's best interests." Also, the district court found that father failed to learn of his children's special needs until the termination trial began, and likely had not acquired an adequate understanding of those needs.

Clear-and-convincing evidence supports the district court's findings that the children need stability and have special needs requiring immediate and continuing services. Additionally, clear-and-convincing evidence supports the district court's finding that, at the time of trial, the children exhibited improvements in their behaviors while in foster care. Finally, clear-and-convincing evidence supports the district court's finding that father's long absences and failure to "provide [the children] with an alternative to living with an abusive mother" led to the children spending years in foster care, shelters, and "other undesirable living situations." Thus, the district court's determination that terminating father's parental rights is in the best interests of the children was not an abuse of discretion.

**Affirmed.**