*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1170**

In the Matter of the Welfare of the Child of: V. R. E., Parent

**Filed December 27, 2016
Affirmed
Smith, John, Judge**[*]

Hennepin County District Court
File No. 27-JV-15-6979

Mary F. Moriarty, Chief Public Defender, David W. Merchant, Assistant Public Defender, Minneapolis, Minnesota (for appellant V.R.E.)

Michael O. Freeman, Hennepin County Attorney, Kacy Wothe, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Petra E. Dieperink, Assistant Public Defender, Minneapolis, Minnesota (for respondent B.A.B.)

Jody M. Alholinna, El-Ghazzawy Law Offices, Minneapolis, Minnesota (for guardian ad litem)

Considered and decided by Peterson, Presiding Judge; Hooten, Judge; and Smith, John, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**SMITH, JOHN**, Judge

We affirm the district court's termination of appellant-mother's parental rights because the district court did not abuse its discretion in finding that there was clear and convincing evidence that appellant-mother is palpably unfit to be a parent to the parent-and-child relationship and termination is in the child's best interests.

**FACTS**

Appellant-mother V.R.E. is the biological mother of L.R.B., born April 16, 2015. Mother also has two other biological children, A.E., born May 2005, and J.E., born July 2009. In 2005, respondent Hennepin County Human Services and Public Health Department (county) filed a child in need of protection or services (CHIPS) petition for A.E. Mother complied with the case plan for that case and A.E. was reunited with her. In 2006, the county filed another CHIPS petition for A.E. In 2007, the district court transferred physical and legal custody of A.E. to a relative of mother because mother failed to comply with her case plan and did not use the services offered to correct the conditions which led to the out-of-home placement. In 2010, the district court transferred custody of A.E. back to mother finding that mother had "been sober slightly over one year and [was] highly motivated to parent [A.E.] and maintain a sober lifestyle."

In 2013, Ramsey County filed a CHIPS petition regarding A.E. and J.E., alleging that mother had run outside with J.E. in single digit temperatures when J.E. was "only wearing socks" and that she had been intoxicated when doing so. The district court found mother in default on the CHIPS petition after she failed to appear or contact the court or

2

any of the parties, deemed its allegations true, and adjudicated A.E. and J.E. CHIPS. Ramsey County filed separate petitions to transfer legal and physical custody of the children and the district court transferred legal and physical custody of A.E. and J.E. to relatives of mother.

Because of mother's prior child-protection history, the county provided mother voluntary services after L.R.B. was born, including parenting, housing assistance, and mental health services. The county provided these services with the goal of keeping the child safe from abuse and neglect. The county considered ending case management early, but decided to keep mother's case open longer after mother indicated that she needed additional assistance. Case management closed for mother in October 2015. At the time that the case closed, mother's assigned social worker had identified no safety risks associated with her parenting and gave mother credit for her engagement in services during the six months that the case was open. Mother was accepted into the Perspectives Supportive Housing Program in September 2015 and moved into a furnished apartment in early October 2015. Perspectives provides many programs to its residents, including weekly parenting education programs, AA sessions, and mental health programs including therapy.

On December 10, 2015, the county filed a termination of parental rights (TPR) petition regarding L.R.B. The petition alleged that on December 3, 2015, mother had left her apartment at Perspectives from 12:30 p.m. to 2:30 p.m., to attend therapy, leaving

L.R.B. in the care of her boyfriend, Miguel Neumiller.[1]  When mother returned home, Neumiller was giving L.R.B. a bath.  Mother reported that she observed bruising on L.R.B.'s face, asked Neumiller if L.R.B. had fallen, and Neumiller did not answer.  The petition alleged that later that afternoon, mother left her apartment a second time to go to a grocery store, again leaving L.R.B. in Neumiller's care.  When mother returned from the grocery store, mother reported that she observed a red mark on the side of L.R.B.'s neck "like something had been wrapped around her neck," little marks and dried blood on L.R.B., and saliva and blood on L.R.B.'s crib sheets.  The petition alleged that mother again asked Neumiller about the marks and he began to cry.  Mother asked him why he was crying and Neumiller said it was because mother thought he did something to L.R.B.  The petition alleged that mother decided not to take L.R.B. to daycare the next day because she was afraid that a child protection report would be made and that L.R.B. had not received medical care for over 24 hours after the injury.

The district court held an emergency protective care hearing regarding the petition.  Following the hearing, the district court ordered L.R.B. into out-of-home placement and relieved the county of its obligation to provide reasonable efforts to reunify mother and L.R.B. because the TPR petition stated a prima facie case that "[t]he parent has subjected the child to egregious harm."  Although the county was relieved of its obligation to provide reasonable efforts, the county established a voluntary case plan for mother.

---

[1] Mother had previously known Neumiller as Michael Fairbanks.  On December 2, 2015, mother learned that "Michael Fairbanks" was an alias.

4

In April and May 2016, the district court held a trial on the TPR petition. Following the trial, the district court concluded that five of the alleged statutory grounds for termination were supported by clear and convincing evidence.[2] The district court concluded that termination of parental rights was in L.R.B.'s best interest and terminated mother's parental rights to the child.

Mother filed a "Motion for New Trial and/or Amended Findings and Order," requesting that she continue to have supervised visitation during post-trial proceedings and alleging that the district court erred in "signing the [county's] proposed findings verbatim," "admitting expert testimony from the Guardian [ad litem] and from the child protection social worker," terminating mother's parental rights where there "was not sufficient admissible evidence to support" that determination, denying mother's motion to remove the guardian ad litem, and admitting inadmissible evidence. The district court denied mother's motion.

## DECISION

"Parental rights are terminated only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). A district court's decision in a termination proceeding must be based on evidence concerning the conditions that exist at the time of trial. *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007), *review denied* (Minn. July 17, 2007). An appellate court "exercises great caution in termination

---

[2] The county agreed to dismiss the abandonment statutory ground pled in the petition under Minn. Stat. § 260C.301, subd. 1(b)(1) (2014).

proceedings, finding such action proper only when the evidence clearly mandates such a result." *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996).

On appeal, this court examines the record to determine whether the district court applied the appropriate statutory criteria and made findings that are not clearly erroneous. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). In doing so, this court defers to the district court's credibility determinations. *See In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996) ("Considerable deference is due to the district court's [TPR] decision because a district court is in a superior position to assess the credibility of witnesses."). "A finding is clearly erroneous if it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). "[A] district court's findings in support of any TPR order must address the best-interests criterion." *In re Welfare of the Child of D.L.D.*, 771 N.W.2d 538, 546 (Minn. App. 2009); *see* Minn. Stat. § 260C.301, subd. 7 (2014) ("[T]he best interests of the child must be the paramount consideration . . . ."). This court gives the district court's decision to terminate parental rights considerable deference but "closely inquire[s] into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008).

The district court terminated mother's parental rights based in part on Minn. Stat. § 260C.301, subd. 1(b)(4) (2014).[3] Minn. Stat. § 260C.301, subd. 1(b)(4), allows termination when a parent

> is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Mother argues that "there was clear and convincing evidence at trial that [she] complied with her case plan and was able to parent L.R.B." She contends that the district court erroneously relied on her purported failure to show "meaningful change" as the basis for termination under Minn. Stat. § 260C.301, subd. 1(b)(4).

The district court found that "mother's child protection history and repeated poor parenting decisions are a consistent pattern of specific conduct that is of a duration that renders [mother] unable for the foreseeable future to care appropriately for the ongoing physical, mental, and emotional needs of [L.R.B.] or any other child." The district court noted that "[t]he circumstances that led to this case are not the first time that [mother] has

---

[3] The district court also relied on four other statutory grounds to terminate mother's parental rights: Minn. Stat. § 260C.301, subd. 1(b)(2) (parent has failed to comply with parental duties), (b)(5) (reasonable efforts have failed to correct conditions leading to child placement), (b)(6) (child has experienced egregious harm in parent's care), (b)(8) (child is neglected and in foster care) (2014).

demonstrated poor parenting judgment, put a child in an unsafe situation or had a concerning intimate relationship," that "[t]hese are the same concerns identified in her prior child protection cases," and that "mother has a long history of neglecting children and exposing them to unsafe situations dating back eleven years."

The district court also found that mother's mental health and chemical dependency issues demonstrate that mother "lacks the capacity to adequately care for children."[4] The district court noted that "mother has serious mental health diagnoses and long-term trauma that she has been unable to satisfactorily address during the case" and that "[d]espite repeated and consistent interventions including five treatment programs and ongoing supports, [mother] has continued to relapse." The district court took "into consideration how well [mother] complied with the [county]," but found that "neither her case plan compliance nor the more than a decade of treatment have ensured her ability to maintain sobriety and meet the needs of her child." The district court found that "[e]ven with all the supports of the Perspectives sober housing program, [mother] continues to demonstrate her lack of insight and meaningful change, as well as her inability to appropriately protect and care for her child." These findings are supported by the record.

---

[4] Following mother's psychological evaluation in July 2015, mother was diagnosed with Posttraumatic Stress Disorder, Major Depressive Disorder, Borderline Intellectual Functioning, learning disorders, and Alcohol and Cannabis Use Disorder. Mother also completed a diagnostic assessment with her individual therapist in January 2016 which indicated that mother no longer met the diagnostic criteria for Posttraumatic Stress disorder, but continued to meet the diagnostic criteria for Major Depressive disorder.

*Child-Protection History*

Mother's first involvement with child protection was in 2005, when the county filed a CHIPS petition for A.E. shortly after his birth based on maltreatment. Mother complied with her case plan and A.E. was reunited with her. One year later, the county filed another CHIPS petition for A.E. based on maltreatment. Mother failed to use the services offered to correct the conditions which led to the out-of-home placement. Mother voluntarily agreed to transfer physical and legal custody of A.E. to a relative. In 2010, the district court transferred custody of A.E. back to mother, noting that although mother "has had past chemical dependency issues, she has been sober slightly over one year and is highly motivated to parent [A.E.] and maintain a sober lifestyle." The district court also noted that mother was then "engaged in a supportive environment, which include[d] therapy and counseling."

In 2013, Ramsey County filed a CHIPS petition regarding both A.E. and J.E. The CHIPS petition alleged that while mother was "very intoxicated" she struck two people, hitting one of them in the face and breaking his nose. The CHIPS petition alleged that mother then ran outside with J.E. even though J.E. "was only wearing socks and the temperature was in the single digits." The CHIPS petition also alleged that mother did not have a permanent residence and that mother had "put [J.E.] in danger by allowing him to stay with her in different homes with acquaintances she is not familiar with." The district court found mother to be in default on the CHIPS petition after she failed to appear or contact the court or any of the parties, deemed its allegations true, and adjudicated A.E. and J.E. CHIPS. Ramsey County filed petitions to transfer legal and physical custody of

the children, alleging that mother failed to make case plan progress, lacked necessary parenting skills, and had a history of limited judgment and decision-making ability which negatively affected her choices, behaviors, and relationships and interfered with her care of A.E. and J.E. In 2014, mother voluntarily agreed to transfer legal and physical custody of A.E. and J.E. to relatives.

The record establishes that before this case, mother was involved in three different CHIPS cases regarding her other biological children. On two occasions, mother made enough progress to be reunited with a child, only to be involved in another CHIPS case because she again failed to adequately care for her children and keep them safe. When physical and legal custody of A.E. was transferred back to mother in 2010, the district court noted that mother was highly motivated to parent him and maintain a sober lifestyle and was engaged in a supportive environment, which included therapy and counseling. According to allegations in the 2013 CHIPS petition, which the district court deemed true, mother left A.E. in the care of a relative approximately two years later because she relapsed and was drinking heavily again. Approximately three years after physical and legal custody of A.E. was transferred back to mother, mother exposed J.E. to an unsafe situation while she was intoxicated and failed to provide J.E. a safe and stable home. Moreover, the circumstances described in the records from the prior CHIPS proceedings suggest that mother has not learned how to develop an appropriate protective capacity and keep her children safe. For example, the 2013 CHIPS petition stated that mother allowed J.E. to "stay with her in different homes with acquaintances she is not familiar with." Likewise,

10

L.R.B. was injured after mother left her in Neumiller's care, despite mother only having dated Neumiller for two weeks at the time.

Mother's child-protection history demonstrates a pattern of making some progress and engaging in services in the short-term, and then once again exposing her children to dangerous situations. This history, combined with the recent abuse that L.R.B. suffered and mother's relapse shortly before the TPR trial, supports the district court's finding that mother will not be able to care appropriately for L.R.B.'s needs long-term.

*Impact of Services Provided to Mother*

Mother's voluntary case plan in this case included completing an updated parenting assessment, working with a parenting skills worker, continuing to attend AA/NA meetings, continuing to submit UAs, addressing domestic violence and how it impacts mother's ability to make safe decisions for herself, continuing to work with her therapist, engaging in trauma-informed therapy, continuing to take psychotropic medications to manage her mental wellness, and continuing to stay in safe and supportive housing. Mother's social worker testified that all of the services identified in the voluntary case plan, aside from the updated parenting assessment and parenting skills worker, were services that mother had received in the past or was currently receiving. This testimony is supported by a January 2016 letter from a representative from Perspectives, which indicates that mother was participating in chemical health treatment, individual therapy, Structured Relapse Prevention group, and a parenting class at Perspectives. Mother has also participated in five different chemical treatment programs and currently takes medications prescribed by her primary care provider to manage her mental health symptoms.

11

Mother argues that she complied with her voluntary case plan in this case and points out that the district court acknowledged her case plan compliance. Mother notes that her previous social worker gave her a very positive report when her first case plan regarding L.R.B. ended in October 2015, contends that she made "tremendous progress" with her previous social worker, and argues that the December 3 incident did not "transform, overnight, [the previous social worker's] studied assessment of [her] ability to parent."

Mother is correct that the district court found that "the majority of provider reports have been positive" and that mother is "utilizing services to the best of her ability." However, the district court also found that the "services [mother] has participated in are likely beneficial to her but were mostly previously in place when the child was injured," and that although "mother has completed a number of services," she "has not ultimately been successful in their completion" because she has failed to demonstrate change and continues to make decisions that put her child in unsafe situations. These findings are supported by the record.

Despite all of the services that mother had received prior to December 2015, she still decided to allow Neumiller to supervise L.R.B., a vulnerable seven-month-old child, alone on December 3, when she had only been dating Neumiller for two weeks at that point, knew he was going by an alias, and was aware that he had been charged with a crime that could result in him being imprisoned for 15 years. Mother also knew at the time that Neumiller supervising L.R.B. alone at her apartment amounted to two lease violations because he was not on the approved visiting list and was present at the apartment when she was not present there and that such lease violations could jeopardize her housing. Mother

once again left the child in Neumiller's care while she went to the grocery store, even though she noticed that the child's face was red and saw "marks on her" from a distance, observed that Neumiller seemed "overly protective of [L.R.B.]," and found it "kind of awkward" that Neumiller was giving L.R.B. a bath.

Mother told the child-protection investigator that when she returned to the apartment, she did not immediately inspect the marks again. When mother did inspect L.R.B.'s injuries, she saw that they were significant: something red on her neck that "kind of looked like something [had been] wrapped around her neck," "little marks" and "dried up blood," five marks on her head, including a "really dark mark" on the side of her face, and a bruise by her eye that "look[ed] like somebody hit her." Mother did not seek medical attention for these significant injuries to L.R.B. until a day later after her friend A.G. and her Perspectives case manager repeatedly urged her to take L.R.B. to the hospital. Mother also told the child-protection investigator that she decided not to bring L.R.B. to daycare the day after the incident because she was concerned that they were "going to call Child Protection." Mother's Perspectives case manager testified that mother repeatedly expressed her concern that she would lose her housing when her case manager encouraged her to take L.R.B. to the hospital. Mother's case manager at Perspectives further testified that mother continued to have unauthorized visitors in her apartment following the December 3 incident and brought unauthorized guests into her apartment during non-visiting hours even though at the time mother was not authorized to have any visitors as a

13

result of the December 3 incidents.[5] These violations and the lease violations mentioned above are especially concerning because mother's failure to maintain stable housing was an issue in her previous child-protection cases.

Finally, the child-protection investigator who interviewed mother following the incident testified that it appeared that mother was protecting Neumiller because it seemed like she knew his whereabouts, did not give them any information, and was not proactive in the investigation. The investigator testified that this concerned her because she would expect a mother to do her best to try to find the perpetrator who abused her child.

In sum, the record indicates that mother continues to make decisions which evidence an inability to keep her child safe and provide for her needs, despite the many services she has received during years of child-protection involvement.

Mother argues that the opinion of her social worker during the current child-protection case is "suspect and dubious because of her inexperience and indisputable confusion about her role in child protection proceedings." Mother also contends that her social worker was unable to work with her "in a professional manner" and otherwise lacked the skill and capacity to assess parenting ability. However, the district court found mother's current social worker's testimony credible. And this court gives that credibility determination deference. *See L.A.F.*, 554 N.W.2d at 396 ("Considerable deference is due to the district court's [TPR] decision because a district court is in a superior position to assess the credibility of witnesses."). Moreover, as noted above, there is evidence in the

---

[5] Although mother was permitted to have her sisters visit her, her case manager testified that one of the authorized visitors was male.

record that mother has failed to demonstrate an ability to consistently provide for L.R.B.'s needs, despite the many services she has received.

Clear and convincing evidence supports the district court's findings regarding mother's child-protection history and failure to demonstrate insight, meaningful change, and an inability to protect and care for L.R.B. despite the years of comprehensive services she has received. Based on these findings, the district court's determination that mother is palpably unfit to be a party to the parent and child relationship is not an abuse of discretion. Because the record clearly and convincingly establishes palpable unfitness as a ground for termination under Minn. Stat. § 260C.301, subd. 1(b)(4), this court need not review the four other statutory grounds on which the district court relied. *See In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005) ("Only one ground must be proven for termination to be ordered.").

## II.

A child's best interests can preclude termination of a parent's parental rights, even if the district court rules that one or more of the statutory bases for terminating that parent's parental rights is present. *D.L.D.*, 771 N.W.2d at 545. In making a finding regarding the best interests of a child, courts must analyze (1) "the child's interests in preserving the parent-child relationship," (2) "the parent's interests in preserving the parent-child relationship," and (3) "any competing interests of the child." Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). "Where the interests of parent and child conflict, the interests of the

15

child are paramount." Minn. Stat. § 260C.301, subd. 7. This court reviews a district court's determination that termination is in a child's best interest for an abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 17, 2012).

Mother argues that the district court "erred in determining termination was in the best interests of L.R.B." because mother "was not a lost cause as the court concluded, and because of the presumption that a child is best parented by her natural parent." Mother contends that a less severe measure, such as continuing CHIPS jurisdiction, was more appropriate than termination of parental rights.

The district court found that mother "truly loves her child" but "she has not demonstrated during the case that she is willing or able to put her child's interests above her own in order to put herself in a position to keep her child and meet the child's needs within the foreseeable future." The district court found that mother "continues to minimize what happened to her child and her role in the child's injuries" and that although mother "has consistently stated that she is motivated to change throughout the case, that motivation has not produced the necessary results." The district court also found that "mother has demonstrated minimal insight into the issues of the case and continues to make poor decisions that jeopardize her housing and her long-term stability."

The district court found that the "evidence is clear and convincing that [mother's] behaviors have negatively impacted her child and exposed her to harm" and that "the child has a strong interest in a caregiver that can provide her with stability, keep her safe and

16

meet her needs." The district court noted that L.R.B. is also young enough to attach to a new long-term caregiver.

The district court expressly found that a continued CHIPS jurisdiction disposition would not be in the best interests of the child. The district court reasoned that mother "has been given every opportunity to show through services why it is in the child's best interests to maintain the relationship despite [the] harm" caused to the child and that mother "has not given the Court a reason to believe that she is likely to adequately follow through with addressing the issues of the case with more time." The district court also noted that mother has longstanding chemical dependency issues, has a "long track record of participating in treatment programs and having some success only to subsequently relapse and fall back into instability," and that mother's "reported period of sobriety remains quite short and she continues to relapse." The district court noted that mother has attended five different treatment centers and that her most recent relapse was in the spring of 2016. The district court found that mother has completed years of services from multiple providers, but "[d]espite all the services she has received, she continues to ask for more making it unclear if there are enough services to ever adequately address her issues that prevent her from safely parenting."

The district court reasoned that L.R.B. "deserves a caregiver that can provide her with stability and consistent care for the rest of her childhood and into adulthood, and allowing . . . mother more time will simply result in more instability for the child and unnecessarily delay permanency." The district court therefore concluded that it was in the best interests of L.R.B. to terminate mother's parental rights.

17

The district court's best-interests findings are supported by the record, and its best-interests analysis is thorough. L.R.B. needs a parent who can provide her with stability, keep her safe, and ensure that her needs are met. It is clear that mother loves L.R.B. But the record indicates that at the time of trial, mother had not demonstrated an ability to protect L.R.B., provide L.R.B. a safe environment, and put L.R.B.'s interests above her own. And the record demonstrates that mother is unlikely to make the change necessary to ensure that she can consistently protect L.R.B., provide L.R.B. a safe environment, and put L.R.B.'s interests above her own in the reasonably foreseeable future. The district court did not abuse its discretion in determining that terminating mother's parental rights to L.R.B., rather than continuing CHIPS jurisdiction, is in the best interest of the child.

**Affirmed.**